In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 07-2649 & 07-2930

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES E. ROLLINS, SR. AND RUDY SLACK,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Southern District of Illinois.
No. 05 CR 30133—**David R. Herndon**, *Chief Judge.*

ARGUED APRIL 14, 2008—DECIDED SEPTEMBER 15, 2008

Before FLAUM, EVANS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Beginning in August of 2004, various law enforcement agencies in southern Illinois combined their efforts to concentrate on the investigation of drug distribution and drug crimes in the Alton, Illinois, area. Their endeavors resulted in an eighteen-count, twelve-defendant federal indictment in the district court. Most of the defendants entered pleas of guilty, but a

handful of them contested the charges at what turned out to be a thirteen-day jury trial. This appeal is brought by two of those trial defendants, James E. Rollins Sr. and Rudy Slack,[1] against whom the jurors returned verdicts of guilty on the charge of conspiracy to distribute cocaine and 50 grams or more of cocaine base, that is, "crack" cocaine.[2] Rollins Sr. also was convicted on one count of distributing 500 grams or more of cocaine (Count 5). Slack suffered additional convictions on one count of distributing cocaine (Count 6) and one count of distributing 5 grams or more of crack (Count 7). Rollins Sr. was sentenced to 97 months of imprisonment; Slack was sentenced to 108 months of imprisonment. They both challenge their convictions on appeal and Slack contests his sentence.

---

[1] It is often the situation in drug distribution organizations that a number of the participants are related, and confusion can arise from the similarity of some of their names. As you will learn, Appellant James E. Rollins Sr.'s son and namesake, James E. Rollins Jr. was a participant in this drug organization and a defendant at trial. Rudy Slack (who also goes by the names Enoch Rudy Slack, Enoch Smith and Rudy Smith) also had relatives in this drug business, including his half-brother Donald Slack. To minimize confusion, Appellant James E. Rollins Sr. will be referred to as "Rollins Sr." and his son will be referred to as "Rollins Jr." Similarly, Appellant Rudy Slack will be referred to as "Slack" or "Rudy Slack" and his half-brother will be referred to as "Donald" or "Donald Slack."

[2] "Crack" is the street name for a type of cocaine base which is different from powder cocaine. *See United States v. Grayson*, No. 07-3867, 2008 WL 2787495, at *1 (7th Cir. Jul. 18, 2008).

## I. Background

In the early stages of this investigation, law enforcement used an informant to purchase crack cocaine from co-defendant Eric Spruill. On November 1, 2004, Spruill went to Rudy Slack's apartment in Alton to obtain crack, which Spruill intended to sell to the informant (of course, without a clue that she was actually an informant). Spruill, who later negotiated a guilty plea conditioned on his coopera-tion as a witness for the government, testified at trial that on that occasion, he went into the apartment and saw Donald Slack and Rudy Slack in the kitchen cooking large quantities of powder cocaine into crack. Spruill was overcome by the odor and went outside. A short time later Slack met Spruill outside and sold him 12.2 grams of what was later tested and found to be crack cocaine. More on the Slacks later.

The big fish caught by the DEA's investigative net was co-defendant Richard Pittman, a powder cocaine and crack cocaine distributor and also a daily and heavy marijuana user. Pittman, who was also persuaded to become a witness for the government, testified at trial that he attended a family reunion in Alton during the summer of 2002. James Rollins Jr., John Frost, Talia Pittman and Slack also attended the reunion. Pittman testified that he and co-defendant Rollins Jr. started up a cocaine distribution relationship. Shortly after the family reunion, Rollins Jr. delivered a kilogram of cocaine to Pittman who then sold it to others. Rollins Jr. and Pittman continued their powder cocaine distribution relationship until 2005 (excepting a brief period of time when Pittman was incarcerated). They

dealt in one-half and one-quarter kilogram amounts which Rollins Jr. delivered twice a month to Pittman via John Frost, who was employed by Rollins Jr.'s trucking company. After approximately one year, in the summer of 2003, James Rollins Sr. began making the cocaine deliveries to Pittman in the Alton, Illinois, area. Sometimes Pittman converted the cocaine powder into crack cocaine.

Pittman testified that on March 20, 2005, he went to Rollins Sr.'s home in St. Louis, Missouri, to purchase cocaine. During his trip, the two men had phone conversations which were intercepted by law enforcement. Pittman identified the voices on the calls as his and Rollins Sr.'s. Once Pittman arrived at Rollins Sr.'s home, Rollins Sr. measured out 9 ounces (1/4 kilogram) of powder cocaine and sold it to Pittman for $5,400. Rollins Sr. gave Pittman powder cocaine only; Pittman would later convert some of the powder cocaine to crack cocaine. While inside Rollins Sr.'s home, Pittman saw 18 ounces of powder cocaine and a set of digital drug scales.

Pittman testified that in March 2005 he moved to Atlanta and continued to make arrangements with Rollins Jr. for cocaine and continued to receive cocaine from Rollins Sr. According to Pittman, after Bubba "Catfish" Smith's funeral on April 15, 2005, he received a duffel bag containing 9 ounces of cocaine from Rollins Sr.

Co-defendant Tamiesha Williams, Pittman's common law wife, who like Pittman smoked marijuana daily, just not as much, also agreed to serve as a witness for the government. At trial, she testified that Rollins Sr. delivered powder cocaine to Pittman at her house every two weeks

or once a month from the end of 2003 to 2005. She also testified that the cocaine came from Rollins Jr. Williams stated that on April 16, 2005, Rollins Sr. delivered one-half kilogram of cocaine to Pittman and dropped his wallet in the back seat of Pittman's rental car. Williams called him, and Rollins Sr. retrieved his wallet. Williams testified that Pittman continued to deal cocaine with Rollins Sr. in 9 to 18 ounce quantities about three more times after she and Pittman had moved to Atlanta.

As mentioned, the Slacks were involved in other aspects of this drug organization. Around June 2000 when Donald Slack got out of prison, Rudy Slack introduced Donald to a cocaine supplier in California, and Donald resumed his cocaine selling business. In 2003, Donald had an accident which temporarily knocked him out of the cocaine business. To help get him back in the game, Pittman fronted Donald 4 1/2 ounces of cocaine, which came from Rollins Jr. This was enough to get Donald back on his feet in the cocaine business. Donald testified that in 2004 he began to sell larger amounts (2 to 3 ounces at a time) of powder cocaine to Rudy. But the Slacks had a falling-out in September 2004 and stopped dealing with each other until January 2005 when they started up again. According to Donald's testimony, from January until September 19, 2005, when he was arrested, he sold Rudy three to four ounces of powder cocaine at a time, four or five times per week. Donald also testified that he was with Rudy on some occasions when Rudy sold cocaine (that Donald had provided) to others. Donald also converted large quantities of powder cocaine to crack. Donald pled guilty to cocaine distribution charges in a related case.

Co-defendant Alan Taylor, one of Rudy Slack's regular customers, was introduced to Slack by Christy Woolsey, who was a cocaine and crack customer of Rudy's as well. The government also persuaded Taylor to join its parade of cooperating witnesses at trial. Taylor testified that Woolsey told him she got crack from Rudy Slack. Taylor and Woolsey got crack from the Slacks and would smoke it together. Taylor began working for Rudy repairing motor vehicles and was paid with cash and cocaine. Slack also sold crack and cocaine to Taylor on several occasions. At trial, Taylor testified that certain intercepted telephone calls between him and Slack concerned Taylor's obtaining powder cocaine from Slack. According to Taylor, he never bought crack from Slack. Taylor further testified that on April 28, 2005, he obtained one and one-half grams of cocaine from Slack in a parking lot of CTW's in Alton. The police stopped the truck in which Taylor was a passenger (Gary Ontis was the driver) shortly after it left the parking lot and found a small amount of cocaine between the seats.

Slack also supplied Pittman with cocaine and marijuana. At least once, Pittman contacted Slack looking for crack and Slack only had marijuana, which Pittman settled for instead. In addition to illegal drugs, Slack also contacted Pittman to alert him of police activity when the police were actively investigating cocaine trafficking near Pittman's house. At trial, Pittman testified that he was concerned about the police because he did not have a driver's license.

DEA Agent John McGarry led this investigation into drug trafficking in the Alton area. In the course of the investigation, undercover purchases (under government

surveillance) of cocaine were also made from Pittman by an informant.[3] Eventually, the DEA obtained authorization for wire taps for ten phones used by Pittman, the Rollinses, Spruill and Slack. Agent McGarry was involved in the wire tap overhears from the beginning, and he listened to the intercepted calls every day for the duration of the wiretaps, from February to July 2005. He developed a familiarity with the persons using the phones and testified at trial about his impressions of numerous phone calls.

On September 20, 2005, law enforcement executed a search warrant at Rollins Sr.'s home in St. Louis and found drug paraphernalia in his bedroom, including the cutting agents Dorman and Manitol, a precision mixing kit and sifter. They also found a Smith & Wesson firearm in his bedside table along with ammunition. In a kitchen drawer they found a "digimon" drug scale, latex gloves, plastic baggies and plastic mixing bowls. Predictably, Rollins Sr. was arrested. In his post-arrest statement following a *Miranda* waiver on September 20, Rollins Sr. advised investigators, including Agent McGarry, that he was a party to one of the intercepted calls, that he knew Pittman, that Pittman had approached him asking him for "some product," he collected drug proceeds from Pittman for about eighteen months, and that he was paid for his participation in the drug business.

The jury trial began on January 22, 2007. More than 100 recorded telephone conversations were played during trial.

---

[3] Confidential informant Robin Hamilton, Pittman's relative, made closely supervised controlled buys of cocaine from Pittman on January 14 and 18, and February 1, 2004.

Of those, according to Agent McGarry, 43 were alleged drug-related calls between Pittman and Rollins Sr., and 30 were alleged drug-related calls between Rollins Sr. and Rollins Jr. Slack was heard on 22 alleged drug-related calls with various co-conspirators. Agent McGarry testified that he became "very familiar" with the voices he heard on the recorded conversations between the members of the alleged conspiracy. Agent McGarry testified, over objection, as to his impressions about various recorded conversations. (This testimony has become the major issue raised in this appeal.) He testified that his personal impression was that Rollins Sr. was supplying Pittman with cocaine and that Rollins Sr. was getting his cocaine from Rollins Jr. McGarry also testified that based on his involvement with the wiretaps, his impression was that John Frost was assisting with the transport of the cocaine. The agent also testified as to his impression that in conversations between Rollins Sr. and Pittman on March 14, 2005, Rollins Sr. had contacted Pittman to see if he had money available and, in a phone conversation later that day, Rollins Sr. gave Pittman his location. Agent McGarry further testified that his impression was that when Rollins Sr. and Pittman talked about "big shoes and little shoes" in a recorded conversation on March 15, 2005, they were talking about 18 ounces and 9 ounces of cocaine. Another example of the agent's "impressions" testimony concerned his statement that in an April 9, 2005, conversation in which Rollins Sr. and Rollins Jr. referred to "the band" and "the singer," the "band" was a reference to Richard Pittman and the height of the singer, 5' 6", was a reference to the $5,600 that was collected from him. Agent McGarry also testified as to his

impression that various other phone calls between Rollins Sr. and Pittman were conversations about drug transactions.

Pittman also testified about recorded telephone conversations in which he had participated. He said that on March 14, 2005, during a call between himself and Rollins Sr. the term "squares" meant money, and "big shoes" and "little shoes" meant 9 and 4 1/2 ounces of cocaine, respectively. Pittman testified that in a April 16 recorded conversation between him and Rollins Jr., "kids" meant marijuana. Pittman identified recorded conversations with Slack in which he alleged they discussed marijuana; the government argued that the references were to cocaine instead.

## II. Analysis

Both defendants argue that the district court abused its discretion in allowing the case agent to testify (under the auspices of Rule 701 of the Federal Rules of Evidence) as to his impressions of electronically intercepted telephone conversations. They also assert that the court erred in denying their motions for a judgment of acquittal based on insufficient evidence. Rollins Sr. further contends that the court erred in increasing his offense level for possession of a dangerous weapon under U.S.S.G. § 2D1.1(b)(1). Slack claims that the court erred in denying his motion to dismiss the indictment based on what he asserts is a Speedy Trial Act violation and he challenges two other evidentiary decisions. Finally, Slack contends that the court made several errors in sentencing. Specifically, he argues that the court erred in determining the amount of cocaine base for which he was responsible as relevant conduct

under U.S.S.G. § 1B1.3, in failing to appreciate the advisory nature of the Sentencing Guidelines, and in imposing an unreasonable sentence by relying on the Guidelines range for crack cocaine.

We will address the Speedy Trial Act matter first, followed by the challenges to the admissibility of certain testimony. Then we will take up the question of the sufficiency of the evidence. Finally, we will discuss Slack's sentencing arguments.

### A.  Speedy Trial Act

Slack argues the district court erred in denying his motion to dismiss based on a violation of the Speedy Trial Act, 18 U.S.C. § 3161. He focuses on the lack of a contemporaneous ends of justice finding and an allegedly unreasonable delay in arraigning the last co-defendant. The Act provides that "the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." *Id.* § 3161(c)(1). Certain periods of delay are excluded from the Speedy Trial computation, however. *Id.* § 3161(h). These include "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion," *id.* § 3161(h)(1)(F), and "[a] reasonable period of delay when the defendant is joined for trial with a co-defendant as to whom the time for

trial has not run and no motion for severance has been granted," *id.* § 3161(h)(7). We review the denial of a Speedy Trial Act motion de novo when calculation of time is at issue. *United States v. Parker*, 508 F.3d 434, 438 (7th Cir. 2007).

An excludable delay of one defendant may be excludable as to all co-defendants, absent severance. *United States v. Dennis*, 737 F.2d 617, 620 (7th Cir. 1984). On September 20, 2005, the indictment was filed and Slack made his initial appearance. The last co-defendant, Shara Smith, made her initial appearance on March 3, 2006. Thus under § 3161(h)(7) the time period between September 20 and March 3 is excluded from the speedy trial computation, provided it was reasonable. Slack claims that it was not. The question of whether a delay was reasonable depends on the facts of the case. *Dennis*, 737 F.2d at 621. The delay until Smith's appearance was about five and one-half months, which is not unduly long. Slack argues that he did not "sandbag" the district court with respect to his speedy trial challenge and that the failure to oppose the motions to continue trial or to move for a severance were due to "circumstances beyond [his] control." Nonetheless, Slack did not move for severance.

But we may put the delay in arraigning Smith aside. The next to the last of the twelve defendants to make an initial appearance was Rollins Jr., who made his appearance on October 27, 2005. Slack does not argue that the period from his appearance on September 20 until Rollins Jr.'s appearance on October 27 was unreasonable. It was relatively brief and resulted from the fact that Rollins Jr. was only

arrested—outside of the court's jurisdiction in distant California—on October 14, 2005. We have no reason to conclude that the period from September 20 to October 27 was anything other than a reasonable period of delay. And in the time between Slack's appearance and Rollins Jr.'s appearance, several pre-trial motions had already been filed, ultimately resulting in excludable delay until March 13, 2006. After that, more pre-trial motions were filed by co-defendants. The delays resulting from these pretrial motions, from filing to disposition, were properly excluded not only as to the defendants who filed them, 18 U.S.C. § 3161(h)(1)(F), but also as to Slack who, as we have noted, did not seek a severance, *Dennis*, 737 F.2d at 620. And finally, on August 10, 2006, Slack himself filed a pre-trial motion, seeking new counsel. A period of time was excluded due to this motion—until September 7, 2006—and by then, Rollins Jr. had moved for a severance, which resulted in the exclusion of the time through December 18, 2006. Rollins Jr. subsequently filed more pre-trial motions and Slack filed additional pre-trial motions, all of which together resulted in excludable delay up until January 17, 2007. The trial began January 22, 2007.

That leaves Slack to complain about the district court's failure to make a contemporaneous "ends of justice" finding when, on October 25, 2005, it granted Pittman's motion to continue trial. As we recognized in *United States v. Larson*, 417 F.3d 741 (7th Cir. 2005), the district court is not required to make the ends of justice findings contemporaneously with its continuance order. *Id.* at 746. In *Larson* we indicated that "the better practice is for the court to make the required findings at least prior to a defendant's motion to

dismiss the indictment for a violation of the Act." *Id.* That occurred here. On September 6, 2006, the court issued an order making the necessary ends of justice findings with respect to the October 25 continuance. The order noted that the case was complex with twelve defendants; it involved wiretap or telephonically intercepted information, which could make discovery more involved; at the time of Pittman's motion, several defendants had yet to be arraigned, and Pittman's newly appointed counsel needed time to prepare effectively for trial. The court also found that under the circumstances a denial of a continuance likely would result in the miscarriage of justice, even when weighed against the public interest and the defendants' interest in a speedy trial, and noting that none of the other defendants had opposed the continuance. Thus, the court ruled that the time from October 21, 2005, when Pittman sought a continuance, until March 13, 2006, the date for which the trial had been re-set, was excludable time under the Speedy Trial Act. The court's findings were made before Slack filed his January 3, 2007 motion to dismiss based on an alleged speedy trial violation. We find no violation of the Act and therefore conclude that the district court did not err in the denying Slack's motion to dismiss.

## B. Evidentiary Challenges

We review the district court's evidentiary rulings for an abuse of discretion. *United States v. Swan*, 486 F.3d 260, 263 (7th Cir. 2007).

### 1. Agent McGarry's "Impressions" Testimony

Both defendants contend that the district court abused its discretion in allowing Agent McGarry to testify as to his "impressions" of intercepted telephone conversations as lay opinions or inferences under Federal Rule of Evidence 701.[4] Agent McGarry was a key government witness, testifying for two days on direct examination. During his testimony, the prosecutor asked him for his "impression" as to the meaning of portions of several dozen recorded conversations. There were also more than a dozen instances in which the prosecutor, in effect, asked Agent McGarry for his impression of a recorded conversation without using the word "impression." In responding, Agent McGarry gave his impressions that particular numbers referred to amounts of or prices for illegal drugs. He testified that certain words were code words for illegal drugs. And he interpreted various conversations to show that the alleged conspirators' activities were consistent with the charged conspiracy. For example, the prosecutor asked Agent McGarry, "Your impression of what it means for them to say they are going to go have a drink at 10:30 to 11:00

---

[4] Rule 701 provides in pertinent part:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

o'clock?," and Agent McGarry answered, "my impression is this call is also based on—we established surveillance at James Rollins, Senior's residence, anticipating 10:30 or 11:00 arrival of a truck driven by John Frost." The agent then explained that there was no meeting at the appointed time, law enforcement continued surveillance until the early morning hours, and then terminated surveillance because they did not believe the truck would be arriving after the appointed time.

The government disputes whether either Rollins Sr. or Slack made a sufficient objection at trial to Agent McGarry's "impressions" testimony. Thus, the government contends that these defendants have forfeited the issue absent a showing of plain error. We do not have to address the forfeiture argument in detail. First, the record supports the view that there was an agreement between all counsel and the court at the beginning of trial that an objection by one defendant would be considered an objection for all defendants. The government does not dispute that Rollins Jr. made a sufficient objection to Agent McGarry's testimony to preserve the issue. Thus, Rollins Jr.'s sufficient objection would be considered effective as to both Rollins Sr. and Slack. Furthermore, whether reviewed for an abuse of discretion or under the more stringent plain error standard, we find no error in the admission of Agent McGarry's "impressions" testimony.

In allowing the "impressions" testimony, the district court explained:

> [T]he cases that talk about code words talk about witnesses who rely on their years of experience as a law enforcement officer. As we discussed at the

side bar, the discussion here is about the words that come about that are unique to the conversations that have occurred throughout this particular alleged conspiracy. It is clear and it has been clear to this Court throughout that these guys are making this up as they go. Sometimes they make it up in each unique conversation. The officer or the agent is testifying based on his having listened to the conversations and based on his impressions, so it is clearly 701. It is not 702. . . . [T]he words that are being used, quite frankly, I have not heard these words in any other telephone calls that I have heard. . . . [T]he testimony is not coming in based on his experience as the law enforcement officer, it is based on his experience only within this conspiracy.

(Trial Tr. vol. 21, 78.)

Even the conspirators themselves did not always pick up right away on the meaning of these peculiarly coded conversations. During many of the conversations, one of the speakers would start talking out of the blue about "having drinks," the height of a "singer" in a "band," "work," "big shoes and little shoes" and a variety of other things that would appear at first to be virtually nonsensical. For example, as Pittman explained in his testimony, during one conversation he had with Rollins Jr., Pittman initially was puzzled when Rollins Jr. started talking about running into "his little cousin." But as the discussion continued, Pittman figured out what these confusing comments really meant: Rollins Jr. was talking about being short of cocaine. And

there was no pattern or predictability to the terminology. It was helpful to the jury to have explanations from the cooperating witnesses. It was also helpful to have explanations from the investigator who became intimately familiar with the unusual manner of communicating used by these conspirators.

We find that the trial judge did not err in concluding that Agent McGarry's "impressions" testimony was rationally based on his first-hand perception of the intercepted phone calls about which he testified as well as his personal, extensive experience with this particular drug investigation. The agent listened to every intercepted conversation from February through July 2005 on the phones used by Slack, the Rollinses, Pittman and Frost. Agent McGarry testified that he became "very familiar" with the voices he heard. Law enforcement surveillance of the conspirators' activities assisted in giving meaning to various words used in the recorded conversations. The officers' observations of the conspirators' activities often confirmed that their understanding of a recorded conversation was accurate. Agent McGarry participated in the interviews of witnesses who were familiar with the defendants and the drug conspiracy and in obtaining proffers from members of the conspiracy. These bases for Agent McGarry's testimony defeat Rollins Sr.'s claim the government laid an insufficient foundation for this testimony.

We also find that the "impressions" testimony assisted the jury in understanding Agent McGarry's testimony about the intercepted conversations—what the parties to the conversations said and what they meant. This testimony

also assisted the jury in determining several facts in issue, including whether the defendants knowingly and intentionally participated in the charged conspiracy and their roles and extent of their involvement in that conspiracy.

The defendants rely on *United States v. Grinage*, 390 F.3d 746 (2d Cir. 2004), in contending that the "impressions" testimony was erroneously admitted. We, however, disagree with the Second Circuit's view of what is and what is not impermissible lay opinion testimony. In any event, *Grinage* seems unlike this case in a critical respect. The evidence at trial in this case established that certain words had certain meanings to conversation participants at different times; the speakers were making it up as they went along. They did not employ typical drug code words. That does not appear to have been the situation in *Grinage* where the narcotics code words were more readily understandable and not unique to the specific conspiracy, let alone particular conversation, at issue. *See id.* at 748 (recounting testimony of DEA agent that participants in telephone conversation about drug deals did not use code). Thus, Agent McGarry's impressions testimony was not based on any specialized knowledge gained from his law enforcement training and experience in narcotics trafficking generally. Rather, his understanding of these conversations came only as a result of the particular things he perceived from monitoring intercepted calls, observing drug transactions of these conspirators, and talking with the cooperating conspirators about this drug operation as the investigation rolled into the trial preparation phase. He had become intimately familiar with each voice on the calls, particular mannerisms of the speakers and the habits of the conspirators.

We are guided by our recent decision in *United States v. Oriedo*, 498 F.3d 593, (7th Cir. 2007), in which we held that an agent's testimony about how drug dealers use baggies to package drugs was erroneously admitted as lay opinion testimony. We said that the agent's testimony "fits squarely within this court's precedent defining expert testimony by officers as to matters within their experience observing narcotics trafficking practices." *Id.* at 603. In reaching this conclusion, we explained that the agent's "testimony was not limited to what he observed in the search or to other facts derived exclusively from *this particular* investigation; instead, he brought the wealth of his experience as a narcotics officer to bear on those observations and made connections for the jury based on that specialized knowledge." *Id.* (emphasis added); *see also United States v. Miranda*, 248 F.3d 434, 441 (5th Cir. 2001) (holding agent's testimony about code words used in recorded calls admissible as lay opinion because it was based on the agent's "extensive participation in the investigation of *this* conspiracy, . . . [which] allowed him to form opinions concerning the meaning of certain code words used in *this* drug ring based on his personal perceptions" (emphasis added)). Here, though, the code words used in the intercepted conversations were unique to this conspiracy and, at times, unique to the particular intercepted conversation. As the district judge observed, the words about which Agent McGarry testified were not "words in any other telephone calls that [he] ha[d] heard." Therefore, the agent's "impressions" testimony was based on his own personal observations and perceptions derived from this particular case. Such testimony is admissible as lay opinion testimony. *See Oriedo*, 498 F.3d at 603.

In sum, Agent McGarry's "impressions" testimony was not expert testimony. It was not based on scientific, technical or other specialized knowledge within the scope of Rule 702. Instead, his testimony was lay opinion testimony.

To be sure, the jury was well aware that Agent McGarry had years of experience as a law enforcement officer. But we do not think that he was cloaked with an "aura of expertise" which allowed the jury to be unduly swayed by his testimony or that his testimony was based on his specialized knowledge as a DEA agent for several years. Furthermore, at times, Agent McGarry's testimony as to the meaning of certain words used in a conversation was corroborated by the testimony of another witness such as Pittman. The defendants argue that Agent McGarry acted as a summary witness with respect to the intercepted telephone conversations. The record does not support this argument. He did not summarize the conversations; he testified what his impressions or opinions were as to the meaning of words used in the conversations. Rollins Sr. argues that the admission of the "impressions" testimony usurped the jury's role by providing an overall conclusion of criminal conduct. But unlike the agent's testimony in *United States v. Garcia*, 413 F.3d 201, 213-14 (2d Cir. 2005), cited by Rollins Sr., Agent McGarry was not merely telling the jury what result to reach as to the defendants' culpability.

While Agent McGarry's testimony approaches the line dividing lay opinion testimony from expert opinion testimony, we find no error in the district court's decision to allow the "impressions" testimony where, as here, it is based on the agent's perceptions derived from the investi-

gation of this particular conspiracy. The experienced trial judge did not abuse his discretion in admitting this testimony under Rule 701. Besides, the other evidence of guilt of these two defendants is so overwhelming that even if the McGarry "impressions" testimony had crossed the line, it would have, at worst, amounted to harmless error.

## 2. Donald Slack's Challenged Testimony

Rudy Slack contends the district court erred in denying his motion to strike Donald Slack's testimony about Donald's drug dealing with Rudy before September 2004 and after December 2004, maintaining that the testimony involved a different conspiracy than the one charged in the indictment. Slack describes this as "other crimes evidence" which was neither inextricably intertwined with the charged conspiracy nor proper Rule 404(b) evidence. The government responds that Slack did not preserve the issue for appeal.

"In order to preserve a ruling on the admission of evidence for appeal, a party must make 'a timely objection or motion to strike [which] appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context.'" *United States v. Swan*, 486 F.3d 260, 263 (7th Cir. 2007) (quoting Fed. R. Evid. 103(a)(1)). If the ruling is not preserved, then we review for plain error. *Id.* at 264. "Under plain error review, an error must be 'clear or obvious' and 'affect substantial rights'" for reversal of the evidentiary ruling. *Id.* Slack moved to strike Donald's testimony except for his testimony that he had nothing to do with Rudy from September 2004 to January 2005. Slack

asserted: "There was no testimony by the government that any of the cocaine that Donald Slack was dealing with came from anybody in this conspiracy. His testimony was that he was getting his cocaine from other people." (Trial Tr. 21, 15-16.) It strikes us that Slack's motion to strike did not preserve the issue for appeal—the grounds he asserts on appeal were neither stated specifically nor apparent from context. Thus, we review for plain error, which means that the error must be "clear or obvious" and "affect substantial rights" for us to reverse the district court's decision to admit the evidence. *Id.*

But whether the decision to admit Donald's testimony is reviewed for plain error or under an abuse of discretion standard makes little difference. We disagree with Slack's characterization of the testimony about his drug dealings with Donald as "other crimes" evidence. The cocaine and crack cocaine conspiracy was alleged to have taken place from the summer of 2002 through August 2005. Donald Slack's testimony about events prior to September and after December 2004 fit within that time frame. Slack argues that the challenged evidence lacked a connection to the conspiracy because Donald testified that his sources and customers were people not charged in the indictment and there was no evidence that Donald got cocaine from Pittman or the Rollinses. But there was evidence that in 2003, Donald had an accident and was unable to sell cocaine and Pittman fronted him 4 1/2 ounces of cocaine—enough to get him back on his feet in the cocaine business. Pittman just happened to have obtained the cocaine from Rollins Jr. The evidence at trial also supported a finding that Donald made at least two more purchases of powder cocaine from

Pittman. Furthermore, Eric Spruill testified that he saw Donald and Rudy together on November 1, 2004 cooking powder cocaine into crack cocaine, some of which was then sold to Spruill. Whether to believe Donald's testimony that he was not involved in any drug dealing with Rudy Slack in September through December 2004 was for the jury to decide. They chose to credit Spruill's testimony. We find no error in the district court's decision to admit the challenged testimony of Donald Slack.

### 3. Taylor's Testimony Regarding Woolsey's Statements

Rudy Slack argues the district court erred in allowing Alan Taylor to testify that Christy Woolsey told him she got crack cocaine from Slack. He submits that Woolsey's statements were hearsay and not admissible as co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E). Under that Rule, statements of a coconspirator made "during the course and in furtherance of the conspiracy" are not hearsay and are admissions by a party opponent. *United States v. Hargrove,* 508 F.3d 445, 449 (7th Cir. 2007). Use of such evidence does not violate the defendant's Confrontation Clause rights. *Id.*; *Bourjaily v. United States*, 483 U.S. 171, 182 (1987). Slack claims that Woolsey was not a member of the conspiracy. The evidence was more than sufficient to establish Woolsey's membership in the conspiracy, however.

The evidence was that Woolsey and Taylor were friends who "got high" together. Woolsey usually supplied the crack that they smoked and she told Taylor that she got it from a guy named Ru-Ru, who Taylor learned used the

name "Rudy Smith." At trial Taylor identified Rudy Slack as "Rudy Smith." Woolsey also obtained crack from Donald Slack. Taylor testified that sometime in 2005 Woolsey introduced him to Rudy Slack and he went to work as a car mechanic for Slack, getting paid in cash and powder cocaine. Taylor also testified that at the end of 2004 or 2005, Woolsey bought crack cocaine from Slack for her and Taylor. Although Taylor testified that he never obtained *crack cocaine* from Rudy Slack, he did testify that he obtained powder cocaine from him. Thus, we conclude that the district court did not abuse its discretion in admitting Taylor's testimony about Woolsey's statements that she got crack cocaine from Slack under Rule 801(d)(2)(E).

## C. Sufficiency of the Evidence

Both defendants sought a judgment of acquittal as to Count 1, which alleged a conspiracy in violation of 21 U.S.C. § 846. Rollins Sr. also sought a judgment of acquittal as to Count 5, which charged him with knowingly and intentionally distributing 500 grams or more of a mixture of substance containing cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B).

A district court's ruling on a motion for a judgment of acquittal is reviewed de novo. *United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008). Such a motion should be granted only if there is insufficient evidence to support a conviction. *Id.* A defendant's burden in showing the evidence was insufficient to support a conviction is "nearly insurmountable." *Id.* We view the evidence in the light most favorable to the government and will overturn a conviction

"only if the record contains no evidence, regardless of how it is weighed," from which the jury could have found the defendant was guilty. *Id.* (quotation omitted). It is up to the jury to weigh the evidence and determine the credibility of the witnesses; we do not second-guess the jury's assessment of the evidence. *United States v. Graham*, 315 F.3d 777, 781 (7th Cir. 2003).

"A conspiracy exists when: (1) two or more people agree to commit an unlawful act, and (2) the defendant knowingly and intentionally joins in the agreement." *United States v. Griffin*, 493 F.3d 856, 862 (7th Cir. 2007). To prove a conspiracy under 21 U.S.C. § 846, the government "must present substantial evidence that the defendant knew of the illegal objective of the conspiracy and agreed to participate." *United States v. Thornton*, 197 F.3d 241, 254 (7th Cir. 1999).

As for Slack, the government presented substantial evidence to connect him to the conspiracy charged in Count 1. Co-defendant Spruill testified that Rudy and Donald were cooking large quantities of powder cocaine into crack on November 1, 2004. According to Spruill, he had gone to Rudy's home to get crack, and he did—12.2 grams. Co-defendant Taylor testified that he worked for Slack and was paid in cash and cocaine. Taylor testified that Rudy also sold crack and cocaine to him on several occasions. There was evidence that Slack repeatedly sold crack to Woolsey. The government offered evidence of phone calls between Pittman and Slack; while Slack argued the calls were about marijuana, the government argued that they were about cocaine. The jury was free to draw its

own conclusions. In addition, the government introduced evidence that Slack telephoned Pittman to alert him to police activity. All of this is substantial evidence that Slack knew of the conspiracy's illegal objective and agreed to and did participate in it.

However, Slack maintains that the jury's special verdicts were inconsistent and, thus, showed that they found him guilty of a conspiracy other than the conspiracy involving the Rollinses, Pittman and Frost. In the special verdicts as to the Rollinses and Frost, the jury found that the conspiracy did not involve 5 or more grams of cocaine base. However, in the special verdict for Slack the jury found that the conspiracy involved 5 grams or more but less than 50 grams of cocaine base. Slack argues that if the jury had found that he joined a conspiracy with the Rollinses, Pittman, Frost and others as charged in Count 1, then the special verdict amounts should have been identical. Because they were not, Slack maintains there was a prejudicial variance in what was charged and what was proven at trial.

Slack faces a heavy burden in making out his variance claim. As we have stated:

> A variance arises when the facts proved by the government at trial differ from those alleged in the indictment. We treat a conspiracy variance claim as an attack on the sufficiency of the evidence supporting the jury's finding that each defendant was a member of the same conspiracy. A defendant succeeds on a variance claim only by showing that the evidence at trial was insufficient to support the

> jury's finding of a single conspiracy and that he was prejudiced by the variance.

*Griffin*, 493 F.3d at 862 (citations omitted). Further, even if Slack establishes a variance between the indictment and the proof at trial, that variance is not fatal if the government proves a subset of the charged conspiracy. *United States v. Payne*, 226 F.3d 792, 795 (7th Cir. 2000).

The indictment charged Slack and eleven co-defendants with a conspiracy. The jury very well could have found that the conspiracy the Rollinses and Frost had joined with respect to crack cocaine was a subset of the conspiracy in which Slack participated. The fact that Pittman did not implicate Slack in the conspiracy and testified that the telephone calls with Slack involved marijuana rather than cocaine is not controlling. The jury could reasonably find that Pittman was not being forthcoming about Slack's involvement—they were, after all, half-brothers—and that Pittman was trying to protect Slack just as he was trying to protect other family members such as his mother. Nor does the fact that Pittman's common law wife, Tamiesha Williams, herself an active member of the conspiracy, testified that she did not know that Slack played any role in the conspiracy compel a finding that Slack was not connected to the conspiracy. The law does not require each member of a conspiracy to know all the other members of the conspiracy. *United States v. Dortch*, 5 F.3d 1056, 1063-64 (7th Cir. 1993). Furthermore, Williams admitted to having lied and perjured herself in the past in an effort to protect Pittman's family members. As with any witness, the jury was free to decide whether to credit Williams's testimony, in whole, in part, or not at all.

Moreover, the evidence would support a reasonable inference that the Slack brothers cooked large quantities of powder cocaine that they had obtained from the Rollinses, Pittman and others into crack cocaine. Thus, a reasonable jury could find that Slack participated in a conspiracy involving a greater amount of crack cocaine than the subset conspiracy in which some of the other co-conspirators participated. We find substantial evidence in the record supporting the jury's determination that Slack was guilty of the conspiracy charged in Count 1. Therefore, the district court did not err in denying his motion for a judgment of acquittal.

As for Rollins Sr., he contends that although there was testimony that he was involved in telephone conversations with Pittman, Rollins Jr., and Frost, the words "cocaine" and "crack cocaine" were not used in any of them. Agent McGarry's testimony and Pittman's testimony allowed the jury to find that Rollins Sr. and Pittman had various intercepted telephone conversations about drug transactions, specifically cocaine. Rollins Sr. thinks Agent McGarry's "impressions" testimony was inadmissible; we disagree. He argues that no rational trier of fact could have believed Pittman, who had much to gain by implicating him and who had been stoned on marijuana much of the relevant time period. And according to Rollins Sr., no rational trier of fact could have believed the other government witnesses that directly implicated him in a cocaine conspiracy, namely, Ms. Williams, Pittman's common law wife and an admitted liar and perjurer, and Robin Hamilton, Pittman's relative, a paid government informant and a liar as well. While neither Pittman, Williams, nor Hamilton

would be considered completely honest, a reasonable jury could have believed their testimony—and this despite the various reasons to discredit their testimony identified by Rollins Sr. That dooms Rollins Sr.'s argument that the district court erred in denying his motion for judgment of acquittal. *See Graham*, 315 F.3d at 781 ("[We] cannot second-guess the jury's determination of which witnesses were credible and which were not.").

## D.  Sentencing Challenges

We review for clear error the district court's factual findings at sentencing, *United States v. Abdulahi*, 523 F.3d 757, 761 (7th Cir. 2008), and application of the United States Sentencing Guidelines is examined on a *de novo* basis, *United States v. Samuels*, 521 F.3d 804, 815 (7th Cir. 2008).

### 1.  Enhancement for Possession of a Weapon

Rollins Sr.'s offense level was increased by two levels for possession of a firearm pursuant to U.S.S.G. § 2D1.1(b)(1). "[T]he government bears the burden of proving by a preponderance of the evidence that a firearm was possessed during the commission of the offense or relevant conduct." *United States v. Womack*, 496 F.3d 791, 797 (7th Cir. 2007) (quotation omitted). The government need not prove "a connection between the firearm and the offense, only that the weapon was possessed during the offense." *United States v. Yanez*, 985 F.2d 371, 378 (7th Cir. 1993). If the government carries its burden, then the burden shifts to the defendant to demonstrate that it was "clearly improbable"

that the firearm was connected to the offense. *Womack*, 496 F.3d at 798.

The government met its burden. The indictment charged that the conspiracy continued through in or about August 2005. The government offered evidence that on September 20, 2005, at the time of Rollins Sr.'s arrest, the gun and ammunition were found in his bedroom, along with drug paraphernalia, and other evidence of drug trafficking was found in the kitchen. Rollins Sr. offered no evidence to show that it was clearly improbable that the firearm was connected to the conspiracy. He argues that there was no evidence that he carried the gun, brandished it, or used it in any other way in furtherance of the conspiracy. But the government need not prove any of these things. Rollins Sr. also argues that there was no evidence that the conspiracy was still ongoing at the time of his arrest. But mere argument of a supposed earlier end to the conspiracy is not enough. Rollins Sr. points to no evidence to suggest that the conspiracy had ended before his arrest and the discovery of the gun. The district court reasonably could infer from the record including the timing of the discovery of the gun and its presence together with the evidence of drug paraphernalia and drug trafficking that Rollins Sr. possessed the gun during the conspiracy. *See id.* at 798 (concluding no error in adding the enhancement under § 2D1.1(b)(1) where there was "evidence that Womack had a gun in his possession at his home, where he received and sold cocaine, particularly when the gun was in such close proximity to a significant stash of money bundled in various denominations"). Thus, we find no error in the district court's application of an enhancement to Rollins Sr.'s offense level for possession of a firearm under U.S.S.G. § 2D1.1(b)(1).

## 2. Amount of Drugs Attributable to Slack

Slack argues that the district court erred in determining the amount of cocaine base attributable to him as relevant conduct under U.S.S.G. § 1B1.3. He submits that the court erred in relying on drug dealing that was separate from the conspiracy alleged in Count 1. He also claims the court relied on unreliable hearsay statements contained in the Presentence Report (PSR) in determining the drug quantity.

As with other factual findings at sentencing, we review a district court's findings as to relevant conduct and drug quantity for clear error. *United States v. Artley*, 489 F.3d 813, 821 (7th Cir. 2007). Thus, we will affirm the district court "unless, after considering all of the evidence, we are left with a definite and firm conviction that a mistake has been committed." *Id.* (quotation omitted).

The government must prove the amount of drugs attributable to a defendant by a preponderance of the evidence. *Id.* And a defendant has a due process right to be sentenced on the basis of accurate information. *Id.* However, "[e]videntiary standards are relaxed at sentencing; a sentencing court may consider information that has 'sufficient indicia of reliability to support its probable accuracy.'" *United States v. Abdulahi*, 523 F.3d 757, 761 (7th Cir. 2008) (quoting U.S.S.G. § 6A1.3(a)); *see also United States v. Schroeder*, No. 07-3773, 2008 WL 2971805, at *4 (7th Cir. Aug. 5, 2008) (same in the context of relevant conduct). A district court may rely on facts asserted in the PSR if the PSR is based on sufficiently reliable information. *Schroeder*, 2008 WL 2971805, at *4; *Artley*, 489 F.3d at 821. The defendant bears the burden of proving that the PSR is inaccurate

or unreliable. *Id.* If he offers no evidence to question the PSR's accuracy, the court may rely on the PSR. *Id.*

Slack first complains that the district court attributed to him 8.7 grams of crack sold by Donald Slack although his alleged drug dealing with Donald was separate and distinct from the charged conspiracy. "Relevant conduct can be used to enhance a defendant's sentence if it is part of the same course of action or common scheme or plan that gave rise to the defendant's conviction." *United States v. McGowan*, 478 F.3d 800, 802 (7th Cir. 2007). We already have considered and rejected Slack's claim that his dealings with Donald were not part of the conspiracy for which he was convicted. Slack's mere assertion that his drug dealing with Donald was separate and distinct from the proven conspiracy is insufficient without any supporting evidence to call into question the PSR's accuracy.[5] The district court did not err in finding that the 8.7 grams of cocaine base/crack sold to a confidential source was attributable to Rudy Slack.

Slack also claims that Ontis's statement in an interview with the Alton Police Department that Alan Taylor accompanied him on at least ten occasions during the prior few months to purchase crack cocaine from Slack (PSR ¶ 18) contradicted Taylor's trial testimony. At trial, Taylor testified that he never purchased crack cocaine from Slack. We fail to see how Ontis's statement contradicts testimony

---

[5]   Slack incorrectly states, citing PSR ¶¶ 21, 22, that the PSR attributed to him 8.7 grams of crack cocaine sold by Donald. Paragraph 21 of the PSR actually indicates that the confidential source purchased crack cocaine from *Rudy* not Donald.

that Taylor—not Ontis—never purchased crack from Slack. Ontis did not state that Taylor purchased crack from Slack. The district court found the report of Ontis's statement consistent with Taylor's testimony—which the court found credible based on Taylor's trial testimony and plea before the court—and, thus, found the report to have every indicia of reliability. Slack has not pointed to any evidence to question the accuracy of ¶ 18 of the PSR, or, for that matter, ¶¶ 25 and 27 as well, which he challenges in a rather general way only.

In addition, Slack argues that Spruill's allegations (PSR ¶ 23) that he obtained 13 grams of crack cocaine from Slack in 2004 and purchased crack cocaine from him on November 1, 2004, were unreliable. At trial Spruill testified about one purchase of crack cocaine from Rudy Slack on November 1, 2004, reflected in Count 7. Spruill did not testify at trial about any other crack cocaine deals with Slack in 2004, but Spruill's proffer did refer to other crack cocaine sales in 2004. Spruill's proffer was not inconsistent with his trial testimony.[6] Regarding Spruill's statement that he purchased crack cocaine from Slack on November 1, Spruill testified that Donald was present at the time of the purchase. Donald, however, testified that he was not speaking to Rudy from September 2004 to January 2005 and had no drug dealings with Spruill. Whether to believe Spruill's testimony or Donald's testimony was a credibility determi-

---

[6] Spruill also testified that he purchased crack cocaine from Slack on two occasions in early 2005 and attempted to do so on a third, but on that occasion Slack had no crack, so Spruill agreed to buy marijuana from him instead.

nation for the district judge at sentencing. We see no reason to upset the judge's decision to believe Spruill. Furthermore, the district court found Spruill's proffer to be reliable based on its finding that the proffer was consistent with Spruill's trial testimony, his plea before the court and his Stipulation of Facts that he swore to in his plea. We accordingly find that the district court did not err in determining the amount of cocaine base attributable to Slack as relevant conduct for sentencing.

### 3.  Presumption of Reasonableness

Slack argues that the district court failed to appreciate the advisory nature of the Sentencing Guidelines and believed a within-Guidelines sentence was presumptively appropriate. In *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007), the Supreme Court held that the presumption of reasonableness of a within-Guidelines sentence applies only on appellate review; the sentencing court may not presume that a within-Guidelines sentence is reasonable. *See also United States v. Schmitt*, 495 F.3d 860, 864 (7th Cir. 2007). We review de novo a claim that the district court failed to appreciate the advisory nature of the Guidelines. *United States v. Carter*, 530 F.3d 565, 577 (7th Cir. 2008).

Slack identifies two sets of comments by the district court at sentencing which he believes support his view. The court made the first when considering the nature and circumstances of the offense and the seriousness of the offense—§ 3553(a)(1) factors. The judge referred to the Sentencing Commission as the policy-makers and said that courts simply carry out their policy. (Sent. Tr. 48.) The

second was made in the context of discussing the kinds of sentences available—another § 3553(a) factor—and in response to Slack's request that the court consider the Sentencing Commission's proposal to amend the Guidelines to reduce the offense levels for cocaine base (crack cocaine). See U.S. Sentencing Commission, *Report to the Congress: Cocaine and Federal Sentencing Policy* (May 2007). The judge said:

> There are quite a few judges now after the *Booker* decision who have varied for the reasons that the Sentencing Commission has posed to Congress, but I am not one who will vary in advance of Congress saying that it's a reason to do so . . . Congress makes the decision, that policy decision. . . . I don't believe that trial judges are in a position to set policy.

(Sent. Tr. 51.) We do not infer from either set of comments that the district judge thought the Guidelines were mandatory rather than advisory.

The cases Slack cites in which the sentencing courts applied a presumption that a within-Guidelines sentence was appropriate are inapposite. In *United States v. Ross*, 501 F.3d 851 (7th Cir. 2007), the judge said that he thought the sentence to be imposed would do more harm than necessary to deal with the drug problem, *id.* at 852, but he also said that he could not sentence Ross below the Guidelines range and a sentence at the bottom of the range was the "lowest sentence possible." *Id.* at 854. In *United States v. Schmitt*, 495 F.3d 860 (7th Cir. 2007), the judge's remarks suggested "he felt that there was an outside constraint on his discretion that he was not free to set aside." *Id.* at 865.

Furthermore, the judge's stated explanation for the sentence imposed shows that he appreciated the Guidelines' advisory nature, with the exception for crack/cocaine disparity which we address below. The judge considered and specifically mentioned the § 3553(a) factors already mentioned as well as others—the seriousness of the offense, Slack's history and characteristics, the need to protect the public from future crimes of Slack, and the need for the sentence to promote respect for the law and afford adequate deterrence to criminal conduct. Moreover, the judge expressly recognized, "I have discretion in this area" and that he was to impose a sentence sufficient but not greater than necessary to comply with the basic aims of sentencing. (Sent. Tr. 52.) He decided, based on his consideration of the sentencing factors and counsels' arguments, including the mitigating factors urged by Slack to impose a within-Guidelines sentence. Thus, we do not find that the district judge applied a presumption of reasonableness for a within-Guidelines sentence in this case.

### 4. Cocaine Base Guideline Range

Slack's final argument concerns the proper sentencing for crack offenses. Before *Kimbrough v. United States*, 128 S. Ct. 558 (2007), was decided a district judge in this circuit could not question the 100-to-1 ratio of crack to powder cocaine in the Guidelines. *United States v. Taylor*, 520 F.3d 746, 746-47 (7th Cir. 2008). In *Kimbrough*, however, the Supreme Court held that "under *Booker*, the cocaine Guidelines, like all other Guidelines, are advisory only, and that the Court of Appeals erred in holding the crack/powder disparity

effectively mandatory." 128 S. Ct. at 564. Now a district judge may decide that a within-Guidelines sentence for a crack offense is "greater than necessary," taking into consideration the disparity between the Guidelines' treatment of crack and powder cocaine offenses. *Id.* Slack raised a sufficient objection to the crack/powder cocaine sentencing disparity in the district court. The district judge's comments suggest that he thought the disparity was mandatory. The government agreed at oral argument that a remand for reconsideration was appropriate. Thus, we will vacate Slack's sentence and remand for resentencing in light of *Kimbrough*. *See United States v. Clanton*, Nos. 07-1773, 07-2358, 07-2924, 2008 WL 3482762, at *6-7 (7th Cir. Aug. 14, 2008) (remanding for resentencing where defendant objected to crack disparity before the district court).

### III.  Conclusion

For the foregoing reasons, we AFFIRM Rollins Sr.'s and Slack's convictions, AFFIRM Rollins Sr.'s sentence and VACATE and REMAND Slack's sentence for resentencing in light of *Kimbrough*.