In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1249

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TIMOTHY HILLIARD,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 CR 970 — **James B. Zagel**, *Judge.*

ARGUED FEBRUARY 16, 2017 — DECIDED MARCH 24, 2017

Before FLAUM, MANION, and KANNE, *Circuit Judges.*

FLAUM, *Circuit Judge.* Following a sting operation, Timothy Hilliard was charged with ten counts relating to numerous controlled sales of heroin, a heroin-for-guns trade, and a gun and heroin found during the execution of a search warrant at his home. At trial, Hilliard asserted an entrapment defense; the jury ultimately found Hilliard guilty on nine of the ten counts but was unable to reach a verdict on the first count. Hilliard now appeals, asking that we vacate his conviction

and sentence and remand for a new trial on the basis of alleg-
edly inappropriate testimony by a government witness at
trial, as well as inadequate jury instructions on entrapment.
For the reasons that follow, we affirm.

## I. Background

In 2012, Special Agent Chris Labno of the Bureau of Alco-
hol, Tobacco, and Firearms ("ATF") and confidential inform-
ant Henry "Hank" Romano[1] made six controlled purchases of
heroin from Hilliard. Romano and Hilliard had been friends
for several years prior to the investigation, and had used and
distributed cocaine together in the 1990s. Romano had intro-
duced Labno, who was undercover as Romano's "cousin," to
Hilliard. Prior to each transaction, Labno gave Romano an au-
dio- or video-recording device to wear, and surveillance offic-
ers were always present.[2] Labno and Romano also recorded
some additional meetings with Hilliard. In December 2012,
after Hilliard traded a significant quantity of heroin for eight
guns and a sum of cash, Hilliard was arrested. Shortly there-
after, law-enforcement officials recovered additional heroin

---

[1] When the investigation of Hilliard began in 2012, Romano had already
pleaded guilty to a narcotics offense, and had been sentenced to nine
months' imprisonment, based on his cooperation in other, unrelated cases.
(Romano had at that point been cooperating with the government for sev-
eral years and had provided information in approximately three other
cases.)

[2] Romano had also been given a personal recording device that he could
use to record telephone conversations or other meetings with Hilliard. Ro-
mano could turn this device on or off. Labno had instructed Romano to
record his criminal conversations with Hilliard, but not every pertinent
discussion was recorded because it was sometimes impractical (*e.g.*, if Ro-
mano had an unexpected contact with Hilliard).

and a gun from Hilliard's residence during the execution of a search warrant.

Based on the above, Hilliard was charged in a ten-count indictment. The controlled purchases of heroin were charged in Counts One through Seven as violations of 21 U.S.C. § 841(a)(1). The heroin-for-guns trade was charged in Count Eight as a violation of 18 U.S.C. § 924(c). Hilliard's possession of the heroin and gun recovered during the search warrant were respectively charged in Count Nine as a violation of 21 U.S.C. § 841(a)(1) and in Count Ten as a violation of 18 U.S.C. § 922(g).

### A. Hilliard's Trial

The parties stipulated at the start of trial that Hilliard's criminal history included two prior convictions: (1) a 1997 conviction in Tennessee for delivery of cocaine, and (2) a 2002 conviction in Illinois for possession of a controlled substance.

Three ATF agents testified at trial. ATF Special Agent Andy Karceski had not been personally involved in Hilliard's investigation or case, and testified as an expert in drug trafficking on topics including: the typical quantities of heroin involved in personal use and distribution, the manner in which heroin is purchased and sold throughout the typical distribution chain, and drug dealers' tactics to evade law-enforcement detection (*e.g.*, using coded words and having legitimate day jobs). Agent Karceski also explained that law-enforcement agents commonly use informants to secure introductions to wholesale drug traffickers, who otherwise would be leery about selling narcotics to new customers. He testified that law-enforcement officials monitor informants as closely as possible, often using recording devices or debriefs, but that it

is not feasible to record or write reports on every conversation or interaction involving informants.

During Agent Labno's testimony about his work on the case, the government published the recordings made of Hilliard during the investigation,[3] and Labno explained his understanding of the conversations. For example, during the controlled purchase that took place on April 5, 2012, Hilliard had mentioned his customers: "[L]ast time I had some, some off-white shit …, the tooters likin' it but the shooters didn't." Agent Labno had understood Hilliard to be referring to his customers' responses to a prior batch of heroin.

On May 22, 2012, Agent Labno and Romano had met with Hilliard at a bar in Evanston to discuss the exchange of guns for heroin. During that meeting, Hilliard had explained how to run a drug business:

> Well, just gonna give you a little lesson in, since you, you know, you fuckin' around. Only fuck with the people you fuck with cause when you go out, you fuck with other motha fuckers, you put yourself at risk, first of all … . Second of all, you never know the quality … .

Agent Labno had understood Hilliard to be trying to teach Labno about dealing only with trusted suppliers because of the risks that could arise from shopping around. Hilliard had continued:

> Get caught up … . I learned the hard way, when my guys don't have shit dude, I'll sit … .I'll

---

[3] Hilliard stipulated to the observations of the surveillance officer at each purchase.

> wait … .Never let motha fuckers rush you, man … .That's how you get … fucked up, bro  … . I mean, the guys I'm fuckin' with dude, pretty, pretty nice, pretty, respectful loyal, motha fuckers are business men [*sic*], you know what I'm sayin' … . [N]ot all money ain't good money, man.

Agent Labno explained that he had understood Hilliard to be saying that when his regular supplier was out of heroin, Hilliard would simply wait until his trusted supplier was ready rather than looking for another source.

Hilliard had further explained to Agent Labno the importance of controlling addicted customers:

> [Y]ou're playin' with opium dude, you're dealin' with a different product then. When you're dealin' with highly, cause they need it, cause the[y're] sick … .But that's why you always gotta fuckin', you gotta, you gotta know how to run your shit. Keep the number, change it on the[ir] motha fuckin ass, man … . [Y]ou in control, bro, but if you start lettin' them motha fuckers control you, dog … [y]ou're in fuckin' trouble man … .

Hilliard had also discussed interactions with law-enforcement officials: "Once they're onto you dude, you gotta stop … .(unintelligible) [H]ey, anybody say somethin' 'bout me and I hear, I see the police, nuh, I don't sell shit … .That's how I do it, cause they gonna watch you, you know what I'm

sayin'." Agent Labno had understood this to mean that Hilliard would stop selling drugs as soon as he believed he was on the radar of law-enforcement officers.

Further, in a recording from the day of his arrest, Hilliard had referenced his prior conviction in Tennessee and the lessons he had learned from it:

> The only thing about Indiana, or talkin' like rural uh, states. You get caught, you, they gonna hide you … .You won't see [daylight] … .You see what happened to me in Tennessee [referring to 1997 conviction] … .Yeah, you, you can ball, you can ball til you fall but if you get caught, that's it … .You gotta remember in Tennessee though, informants get paid, crackheads get paid to snitch … .The only thing good about here is, you know what I'm sayin', in other states, you know, they can't do that entrapment shit here, you, you will beat that shit. But them other states, that entrapment shit is, they can do it all day. They can like actually set you up, you will still get fucked up. Here, you will beat that shit like a motha fucker.

Agent Labno had understood Hilliard to be discussing (ironically enough) a mistaken impression that Illinois law-enforcement officers could not employ sting operations to arrest targets.

On cross-examination, Hilliard's defense counsel emphasized Hilliard's and Romano's long friendship and the fact that Agent Labno did not know what had been said between

Hilliard and Romano in unrecorded conversations either out-side Labno's presence or prior to the start of the investigation. Agent Labno acknowledged that he was not aware of Hilliard's having sold drugs between 2007 and 2011, even though Romano had been cooperating with the government since 2007.

Defense counsel also asked Agent Labno about uncharged drug transactions—that is, whether there was evidence that Hilliard had sold drugs to anyone other than Romano and Labno:

> Q:     … Do you have any evidence of any other drug deals from my client to any-one besides the government?
>
> A:     I don't—we were unable to, no.
>
> Q:     There was no video or any surveillance of my client selling heroin to anybody else, true?
>
> A:     That's correct.

Defense counsel later returned to the topic of uncharged drug dealing by Hilliard:

> Q:     All right. In other words, there's a possi-ble, at least on May 31st of 2012 [the date of a controlled purchase of heroin by the informant and Agent Labno], that you were his only customer?
>
> A:     That's not my understanding, sir.
>
> Q:     Oh, I know it's not your understanding. I asked you whether it was possible.

A:     Again, anything is possible, but based—
       if you're asking what I believe to be the
       case—

Q:     Don't want your opinion.

A:     Everything is possible, sir, yes.

Q:     I'm not asking for your opinion. But as
       you sit here today, on May 31st, 2012,
       you have any facts, any evidence that Mr.
       Hilliard was selling to anybody but Mr.
       Romano?

A:     Yes, I do.

Q:     Tell me.

A:     Based on the conversations that he was
       having with me, the details he was ex-
       plaining to me, the way he was teaching
       me to be what he considered a better
       businessman, a better drug dealer, he
       talked about selling to other people, he
       talked about the things he did, he talked
       about how he operated.

Q:     All right. Well, he could've been reaching
       back in his experience from 2001 when he
       was dealing cocaine. It's not that hard to
       talk with a drug dealer, someone who's
       been in the business, is it?

A:     Well, that's correct, but cocaine is differ-
       ent than heroin.

Q:     That's all I'm asking, yes or no. But you
       conducted   some   surveillance   during

these 9 months. Every time you did a deal, you had cars conducting surveillance out there, true?

A:     Yes; that's correct.

Q:     Did you follow him from his home to the meet and back to his home, true?

A:     That's correct.

Q:     You never saw him drive anywhere else to make a delivery of heroin, did you?

A:     I believe we followed him on occasion where we did meet him and we believed he was doing a transaction but we weren't able to identify anybody involved.

Q:     That's a maybe because I never saw a report—

[ASSISTANT U.S. ATTORNEY]: Objection.

COURT: The objection is sustained.

Q:     Well, could you indicate the report that you documented that?

A:     It wouldn't be my report. I wouldn't be out there because, as the undercover agent, I wouldn't be expected or wanted to be covering surveillance deals because if Mr. Hilliard would see me, it would be—

Q:     So it's not in a report?

> A:     No, sir, it is in the report. My under-
>         standing is, it's just not in a report that I
>         authored. It was in a report that another
>         agent authored. I believe, in fact, it was
>         listed as part of one of the stipulations as
>         well.

Defense counsel asked for a sidebar, which was not tran-
scribed.[4] Following the sidebar, no testimony was stricken
and no additional objections were noted. Defense counsel
continued examining Agent Labno about his basis for believ-
ing that Hilliard had engaged in an uncharged drug transac-
tion on a particular date (September 18, 2012):

> Q:     You're referring to stipulation number
>         15, I believe, where it says: " … at ap-
>         proximately 6:30 p.m. defendant Timo-
>         thy Hilliard was parked in a Buick in the
>         area of 8025 Keating Avenue, Skokie, Il-
>         linois and talking on his cell phone."
>
> A:     Yes, sir.
>
> Q:     "[A] short time later he drove, his Buick
>         was parked in a lot behind the building
>         at 8025 Keating." Right?
>
> A:     Yes, sir.
>
> Q:     And that's where you're basing that
>         there might've been another deal?

---

[4] Hilliard's motion for a new trial indicated that defense counsel moved
for a mistrial at this time, which the court eventually denied, without prej-
udice.

A:   Yes. As I said, we weren't able to identify anything specific or any people involved.

Q:   I'm not asking for your opinion. I'm asking, did you see him get out of the car or they saw him get out of the car and deliver a package to anybody? It's not in—

A:   No, sir.

During redirect, the government did not elicit any testimony from Agent Labno regarding drug dealing by Hilliard involving customers other than the informant.

ATF Special Agent Rene Marano also testified for the government. He had assisted with the execution of the search warrant at Hilliard's home on the evening of Hilliard's arrest. Agent Marano testified that, in addition to the handgun and heroin that were recovered, he had also found a substantial amount of ammunition, a total of $1,940 in cash, a scale, several plastic baggies, gloves, and a mask at Hilliard's home.

At the conclusion of the government's case-in-chief, Hilliard moved for a judgment of acquittal, which was denied. He also moved for a mistrial based on "various opinions" that Agent Labno had allegedly "volunteered from the witness stand," including his "testimony regarding other drug deals." The government responded that "some of counsel's questions asked for those opinions," and noted that defense counsel never moved to strike any of Agent Labno's answers. The district court denied the motion for mistrial without prejudice, stating: "I could not, with any degree of clarity, find grounds for a mistrial, but if there's a defense, the context may make a difference which is why I'm denying it now to be raised later."

Hilliard testified at trial in his own defense. He spoke about his and Romano's long friendship and admitted that they had sold cocaine together in the late 1990s. However, Hilliard testified that he had not been involved in selling heroin or guns at that time, and that he had later turned his life around, stopped selling drugs, obtained a commercial driver's license, and begun working as a truck driver at Tri-Air. Hilliard said that Romano had continued to deal ecstasy, cocaine, guns, and steroids, but they had remained friends and Romano had attended Hilliard's wedding in 2007.

Hilliard testified that from 2007 onward, he would occasionally run into Romano at the gym or elsewhere, and that each time, Romano would ask about the prospect of obtaining cocaine and Hilliard would respond that he was no longer dealing drugs. In 2010, Hilliard had gotten divorced and had moved back into his mother's house, and he testified that his financial status had declined. Hilliard said that he felt increased financial pressure in 2012, when his eldest child had moved in with him. He testified that during this time, Romano had continued to ask about obtaining cocaine, had tried to pressure Hilliard to start selling drugs again, and had often commented on Hilliard's worsening financial state.

Hilliard explained that in January 2012, he had changed his mind about selling drugs, because he had needed money to support his mother and children. Hilliard said that at that point, he had told Romano that he knew only heroin suppliers, not cocaine suppliers. Although Romano first said he did not know anything about heroin, about two weeks later he expressed an interest. Hilliard had then arranged to obtain heroin from the mother of his son, who had become an addict. Hilliard explained that his early drug-related conversations

with Romano had occurred prior to Romano's first debriefing with ATF agents about Hilliard in March 2012, and that from March to December 2012, Hilliard and Romano had had a number of unrecorded conversations without Agent Labno at Hilliard's house, the gym, or a bar.

Hilliard testified that he never would have sold heroin but for Romano's persistence, and that Hilliard had never sold to anyone besides Romano and undercover Agent Labno. Hilliard also said that the idea of trading guns for heroin had come from Romano. Hilliard claimed that the reason he had sounded so knowledgeable about drug trafficking and guns during recorded conversations was because Romano had instructed Hilliard to impress Labno, and that Hilliard had based what he had told Labno about drug dealing on Hilliard's experience dealing cocaine years earlier.

On cross-examination, Hilliard said that it was only due to his financial circumstances that he had caved into selling drugs again, but admitted that there was no discussion of his purportedly desperate financial status anywhere on the recordings. Hilliard also admitted that it was illegal for him, a felon, to possess a gun, but that he had ordered a handgun for himself from Romano, and that Hilliard had worn gloves during the guns-for-heroin trade to avoid leaving fingerprints behind. Hilliard again denied having any heroin customers other than Romano and Agent Labno. Hilliard said that when he would obtain more heroin than Romano and Labno had ordered, Hilliard would hold it for them until their next order, and that the heroin found at his home was going to be sold to Labno. Hilliard admitted that he had been firm in resisting Agent Labno's attempts to negotiate a lower price, telling Labno that a lower price would happen only if he placed

larger orders consistently. Hilliard also admitted that he had lied to both Romano and Labno on multiple occasions during the investigation, but said he was being truthful while testifying.

The defense also called two character witnesses: a former Tri-Air Vice President of operations who had worked with Hilliard, and Hilliard's cousin. Both testified that they knew Hilliard well and understood his character for honesty and law-abidance to be excellent. On cross-examination, both also said that if Hilliard had asked for assistance with respect to his alleged financial difficulties, they would have helped him.

On rebuttal, the government admitted into evidence records from Hilliard's phone from September 2011 to June 2012, as well as a summary chart showing contacts between Hilliard's phone and Romano's phone. Special Agent Marano testified that, from September to December of 2011, zero phone calls or text messages had been exchanged between the two phone numbers. In January 2012, only one phone call and one text had been exchanged. In February 2012, there had been incoming and outgoing contacts between both numbers, the majority of which had been listed by the phone company as having a duration of one minute. These could have represented calls that had lasted only seconds but had been rounded up in the phone company's records.

During closing arguments, the government made no reference to Agent Labno's testimony about uncharged drug transactions, and defense counsel repeatedly emphasized that there was no evidence of uncharged drug dealing by Hilliard. Hilliard asserted a defense of entrapment as to Counts One through Nine, and the court gave a series of jury instructions

on entrapment. Four of the government's proposed entrapment instructions were given over defense counsel's objections, and the court also refused three instructions proposed by the defense.

## B. Jury Verdict, Post-Trial Motions, and Sentencing

The jury convicted Hilliard on Counts Two through Ten, but could not reach a verdict on Count One.[5] On December 30, 2014, Hilliard filed a motion for judgment of acquittal on Counts Two through Nine, claiming that the evidence was insufficient to prove that he had not been entrapped. Hilliard also filed a motion for a new trial, arguing that: (1) Agent Labno had improperly offered expert opinions during cross-examination; (2) the district court had erred in denying Hilliard's request for a mistrial based on the purported expert testimony by Agent Labno; (3) the district court had erred in admitting Hillard's prior convictions; and (4) the district court had erred in instructing the jury on a multi-factor test for predisposition. The district court denied both motions on January 15, 2015. However, it observed, "[T]his was a case which

---

[5] On January 15, 2015, in the course of denying Hilliard's motions for judgment of acquittal and for retrial, the district court described the verdict as follows:

> My guess would be that the jury thought that maybe there is entrapment on the first delivery, maybe the second. And the truth of the matter is [] it was an issue that was obvious to me as well. But the jury concluded, as I would've concluded, that when you get to the number of deliveries that were made, the finder of fact could believe that it might have started with some form of entrapment but that the government sustained its burden of proof with respect to the later transactions.

the defense could[ ha]ve won, or put another way, it's a case where the government could[ ha]ve lost. There was obviously some weight, evidenced by the final verdict that was rendered, that within the jury itself there was some disagreement."

On January 11, 2016, Hilliard moved for reconsideration of the denial of his post-trial motions. The district court denied that motion on February 2, 2016. On the same day, Hilliard was sentenced to sixty-three months' imprisonment on Counts Two through Seven and Count Nine, with all sentences running concurrently. Hilliard was sentenced to sixty months' imprisonment on Count Eight, to run consecutively to the other sentences. In total, he was sentenced to 123 months' imprisonment.

## II. Discussion

### A.  Agent Labno's Testimony

"[A] mistrial is appropriate when an event during trial has a real likelihood of preventing a jury from evaluating the evidence fairly and accurately, so that the defendant has been deprived of a fair trial." *United States v. Collins*, 604 F.3d 481, 489 (7th Cir. 2010) (citation omitted). The district court's denials of Hilliard's motion for a mistrial and his post-trial motion for a new trial are both reviewed for abuse of discretion. *United States v. Long*, 748 F.3d 322, 327 (7th Cir. 2014) (citation omitted); *United States v. Whiteagle*, 759 F.3d 734, 756 (7th Cir. 2014) (citation omitted).

Hilliard takes issue with Agent Labno's testimony on cross-examination, when in response to a question asking whether Labno had ever seen Hilliard "drive anywhere else to make a delivery of heroin" to other customers, Labno said,

"I believe we followed him on occasion where we did meet him and we believed he was doing a transaction but we weren't able to identify anybody involved." Hilliard makes several arguments as to why he deserves a new trial on the basis of this testimony, including that the testimony was speculative, irrelevant, and prejudicial; that it placed Agent Labno in the dual role of both a fact and expert witness; and that it evidences a violation of Hilliard's due-process rights under either *Brady v. Maryland* or *Napue v. Illinois*. We consider (and reject) each of these arguments in turn:

### 1. *No Prejudice from Agent Labno's Testimony*

Hilliard emphasizes that Labno's response contradicted his earlier testimony that the government did not have evidence that Hilliard had sold drugs to others. Hilliard argues that Labno "took advantage of [defense] counsel's later question on the identical subject" to "volunteer" testimony that was speculative and highly prejudicial given Hilliard's reliance on a defense of entrapment.

The government counters that Labno's answer was responsive, particularly in the broader context of the line of questioning, where Labno had previously conceded in response to defense counsel's questions that "anything is possible," and defense counsel had earlier asked broadly about "any facts, any evidence" of uncharged drug dealing. The government cites to *United States v. Zitt*, 714 F.3d 511 (7th Cir. 2013), in which defense counsel asked a lay witness on cross-examination whether the defendant had known that the witness had gone to prison in 2005, and the witness answered, "I was in prison while he's locked up," revealing the defendant's criminal history, *id.* at 512. Defense counsel's motion for a mistrial was denied, *id.*, and we affirmed the conviction,

finding no abuse of discretion by the district court because the witness "gave an answer that was responsive, fair, and entirely proper given the line of questioning [counsel] was pursuing," *id.* at 513 (citation omitted); *see also United States v. Johnson-Dix*, 54 F.3d 1295, 1303–1304 (7th Cir. 1995) (concluding district court acted within its discretion in denying motion for mistrial where agent was asked whether defendant cooperated post-arrest and agent testified that defendant "was, in my opinion, telling half-truths the entire night," because the agent's response was invited by counsel's question).

Hilliard counters that Labno's answer was not responsive because defense counsel asked for facts, not for speculation or opinion. However, although Agent Labno's immediate answer to defense counsel's question may have been less obviously responsive than the testimony at issue in *Zitt* or *Johnson-Dix*, any potential confusion was thoroughly cleaned up by defense counsel's follow-up questioning, which made clear that the Skokie surveillance to which Agent Labno was referring had not involved the observation of any transaction or even the presence of any individual other than Hilliard.[6] Moreover, the government did not elicit any related testimony during redirect, and the government never referred to or relied on this testimony in arguing that the jury could infer from the evidence that Hilliard had dealt to other customers. Instead, the government pointed to the recordings of Hilliard

---

[6] Indeed, the government points out (and Hilliard does not contest in his reply) that Hilliard's defense counsel never objected to or moved to strike the testimony, or seek curative instructions for the jury, presumably because such actions were unnecessary given the clarifications made through continued questioning.

discussing how he had run his drug business, controlled addicted customers, and avoided law-enforcement detection; the absence in the recordings of any evidence of pressure by Romano; and the lack of phone or text contacts between Romano and Hilliard in the fall of 2011 (which undermined Hilliard's testimony to the contrary). *See, e.g., Johnson-Dix*, 54 F.3d at 1304 ("It is in any event doubtful that the agent's statement had any effect on the jury's assessment of [defendant's] credibility, as the agent already had testified on direct examination, without objection from [defense] counsel, that he had told [defendant] in the course of their discussions that [defendant] was not being entirely truthful … .The agent's statement thus did not deprive [defendant] of a fair trial."). Meanwhile, defense counsel repeatedly emphasized at closing that there was no evidence of Hilliard having had any drug deals with customers other than Romano and Labno. As such, Agent Labno's testimony was non-prejudicial and harmless.

Hilliard points out that the jury deliberated for four days and ultimately returned a verdict of not guilty on one count but guilty on the remainder. He claims that this shows a jury that could very well have been swayed by Labno's testimony. However, the district court's take on the jury's verdict is reasonable, and the court thus acted well within its discretion in denying the motions for a mistrial and for a new trial.

### 2. *No Expert Testimony from Agent Labno*

Hilliard also argues that Agent Labno threw his experience as an ATF agent behind his allegedly conjectural testimony, such that it crossed the line from lay testimony to inappropriate expert testimony. We review de novo a district court's interpretation of the rules of evidence, but we review

its rulings to admit or exclude evidence for abuse of discretion. *See United States v. Schmitt*, 770 F.3d 524, 532 (7th Cir. 2014) (citation omitted); *United States v. Rogers*, 587 F.3d 816, 819 (7th Cir. 2009) (citing *United States v. LeShore*, 543 F.3d 935, 939, 941 (7th Cir. 2008)).

Rule 701 of the Federal Rules of Evidence governs opinion testimony of lay witnesses and provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> > (a) rationally based on the witness's perception;
> > (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> > (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. Rule 702 contains safeguards for expert testimony, and Federal Rule of Criminal Procedure 16(a)(1)(G) requires that such testimony be disclosed to the defendant prior to trial. *See* Fed. R. Evid. 702; Fed. R. Crim. P. 16(a)(1)(G).

Hilliard argues that Labno's testimony violated Rule 701(a) because Labno himself was not present during the events in Skokie being discussed—rather, he referred to the observations of another, non-testifying agent. Hilliard cites to *United States v. Mendiola*, 707 F.3d 735, 741 (7th Cir. 2013), in support; but we explained in *Mendiola* that a witness need not have had "personal interaction" with a defendant in order to

provide appropriate Rule 701 testimony (in that case, identifying the defendant's voice in a recording), *id.* at 741. Rather:

> The requirement that lay opinion be based on the perception of the witness imports into Rule 701 the personal knowledge standard of Rule 602.[7] And the knowledge required by Rule 602 is not absolute or unlimited knowledge but simply that awareness of objects or events that begins with sensory perception of them, a comprehension of them, and an ability to testify at trial about them. … [The agent] listened to the recordings, compared them to the exemplar, and was able to report her perceptions to the jury. To reiterate, if there was a question as to the quality of the perception, that went to the weight the jury attributed to her comparison.

*Id.* (citations omitted). In Hilliard's case, although Labno had not been present in Skokie and had not personally witnessed Hilliard's driving or movements on September 18, 2012, Labno presumably spoke with the surveillance officer who had witnessed those things, or reviewed the surveillance report on which Stipulation 15 was based. And most importantly, as noted above, later questioning immediately clarified the limits of Labno's own knowledge, as well as what exactly had been observed, and tethered Labno's testimony to this particular investigation rather than drawing on his years

---

[7] Federal Rule of Evidence 602 provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602.

of experience. Thus, like the testimony in *Mendiola*, Labno's testimony was reporting to the jury his own (albeit indirect) knowledge and perceptions of the ongoing surveillance in this investigation, and the jury was able to decide how much weight to give Labno's testimony on this matter.

*United States v. Oriedo*, 498 F.3d 593 (7th Cir. 2007), is also instructive. The agent in *Oriedo* was first asked whether, "as a surveillance agent," a given sequence of events "raise[d] any red flags" with him. *Id.* at 602 (alteration in original). The agent testified that he became concerned in watching a second vehicle arrive at a drug transaction because "that indicates to us that there is what is called counter-surveillance occurring and they are looking for law enforcement." *Id.* Oriedo objected that this was an undisclosed expert opinion, so the government withdrew the question and rephrased to ask whether the agent was "personally concerned" about the presence of two vehicles. *Id.* The agent responded in the affirmative because "more than one vehicle … raises concerns about being countersurveillance [sic]." *Id.* (omission and bracketed text in original). We concluded that this was lay testimony under Rule 701 because, although the agent's "specialized knowledge informed his mental state, he was not called upon to testify generally about narcotics counter-surveillance practices or to offer an explicit opinion that what he observed was counter-surveillance." *Id.* (citation omitted); *see also United States v. Rollins*, 544 F.3d 820, 831–32 (7th Cir. 2008) (holding that agent could testify as to his "impressions" of intercepted telephone conversations under Rule 701 because he was explaining coded words and phrases that were unique, such that his understanding came only as result of things he had

perceived, not from specialized knowledge).[8] Similarly, Agent Labno's experience with the ATF may have informed his perception of the surveillance results, but he did not testify generally about signs of a drug transaction or offer an explicit opinion that what he had observed was somehow a drug transaction. His testimony was limited to what he recalled from the surveillance report and/or Stipulation 15—facts derived exclusively from the investigation. And defense counsel's later questioning prevented Labno from making any connections for the jury based on his specialized background. *See Rollins*, 544 F.3d at 832 ("To be sure, the jury was well aware that Agent McGarry had years of experience as a law enforcement officer. But we do not think that he was cloaked with an 'aura of expertise' which allowed the jury to be unduly swayed … or that his testimony was based on his specialized knowledge as a DEA agent … .").

Hilliard additionally contends that Labno's "speculation" was not helpful to understanding his testimony or determining a fact in issue, and thus violated Rule 701(b). But Labno was appropriately responding to defense counsel's questions regarding the lack of evidence of other drug deals by Hilliard, and Labno's initial response, together with his later answers, were helpful in clarifying that issue. Hilliard relatedly contends that Labno's testimony was irrelevant because it had no

---

[8] Hilliard cites to *United States v. Grinage*, 390 F.3d 746, 749–51 (2d Cir. 2004), in which the Second Circuit held that an agent's testimony interpreting recorded phone calls was not proper lay testimony because it usurped the role of the jury by increasing the risk that the jury would rely on that testimony rather than on its own interpretation of the calls. However, we explicitly disagreed with the Second Circuit's interpretation of Rule 701 in *Rollins*. *See* 544 F.3d at 832.

probative value under Rules 401 and 402, and that because of the enormous potential for unfair prejudice and confusing the jury, the testimony should not have been admitted under Rule 403. For the reasons outlined above, however, the testimony did have some relevance, any risk of prejudice or confusion was effectively neutralized, and the district judge acted within his discretion in admitting the testimony.

   3.  *No Due-Process Violation Under Either* Brady *or* Napue

Finally, Hilliard raises claims under both *Brady* and *Napue*, based on Agent Labno's reference to a "report" by another agent documenting the Skokie events. On one hand, Hilliard claims that if a report other than the surveillance report underlying Stipulation 15 exists and was undisclosed to the defense, he suffered a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). On the other hand, Hillard claims that if the report referenced was the same one underlying Stipulation 15, Labno distorted the meaning of the report to the point of giving false or misleading testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959).

The government submits on appeal that Hilliard's *Brady* argument misconstrues the record, and affirms that there was no other, undisclosed report: Agent Labno clearly was referring to the disclosed surveillance report associated with Stipulation 15, and thus there is no *Brady* issue. The trial transcript supports this contention, and Hilliard offers no evidence to call into question the government's position. *See United States v. Brendia*, 234 F.3d 1274, No. 00-2178, 2000 WL 1716433, at \*3 (7th Cir. 2000) (unpublished table opinion) ("A due process standard which is satisfied by mere speculation would con-

vert *Brady* into a discovery device and impose an undue burden upon the district court.") (citation omitted); *United States v. Morris*, 957 F.2d 1391, 1402–03 (7th Cir. 1992) (affirming denial of *Brady* request and refusing *in camera* inspection where government asserted it had turned over all exculpatory material and defendants offered "nothing but pure conjecture or speculation" that documents contained exculpatory information). We thus move on to Hilliard's claim under *Napue*.

*Napue* stands for the proposition that prosecutors may not suborn perjury, and holds that a defendant's due-process rights are violated when the government obtains a conviction through the knowing use of false testimony. *See* 360 U.S. at 269; *United States v. Are*, 590 F.3d 499, 509 (7th Cir. 2009) (citing *United States v. Holt*, 486 F.3d 997, 1003 (7th Cir. 2007)). Hilliard's *Napue* claim fails for the reasons already discussed. Any initial confusion in Agent Labno's testimony was cleared up through later questioning, and Labno's responses explained the limits of the report's content. This neutralized any specter of "false" testimony, and there was thus no need for the government to clarify or disavow Labno's statement—defense counsel had already done what arguably would have been needed. Hilliard complains that although "[b]efore this court the government's brief makes clear that no other report exists," in front of the jury, it was not clear what report was being discussed, and defense counsel could not question the authoring agent or any other agent about the events at issue—he was limited to cross-examining Agent Labno on the basis of Stipulation 15. Even so, *Napue* "does not require the government … to clear up any possible confusion when the witness's testimony was not perjurous." *Are*, 590 F.3d at 509 (citation omitted). Finally, it is again unlikely that the reference

to the report affected the judgment of the jury, as the government did not rely on this part of Labno's testimony at trial and the case against Hilliard based on other evidence was substantial.

## B.  Jury Instructions on Entrapment

Hilliard also takes issue with a number of jury instructions on the defense of entrapment. We review de novo the legal correctness of jury instructions. *E.g.*, *United States v. Ye*, 588 F.3d 411, 414 (7th Cir. 2009) (citation omitted). The district court has discretion concerning the specific wording of instructions so long as the final result, read as a whole, completely and correctly states the law. *United States v. Cote*, 504 F.3d 682, 687 (7th Cir. 2007) (quoting *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005)). If the instruction contains an error or misguides the jury, we reverse a jury verdict only if the error prejudiced the litigant. *Calhoun*, 408 F.3d at 379 (citation omitted).

### *1.  Elements of Entrapment (Pattern Instruction 6.04)*

"Entrapment is a defense to criminal liability when the defendant was not predisposed to commit the charged crime before the intervention of the government's agents and the government's conduct induced him to commit it." *United States v. Mayfield*, 771 F.3d 417, 420 (7th Cir. 2014) (en banc). The two elements of the defense—lack of predisposition and government inducement—are conceptually related but formally distinct. *Id.* The instruction given on the elements of entrapment read as follows:

> With respect to Counts One through Nine, the government has the burden of proving beyond a reasonable doubt that the defendant was not

entrapped by the informant or law enforcement
officers. The government must prove either:

    1. Law enforcement officers and their
       agents did not induce the defendant
       to commit the offense; or

    2. The defendant was predisposed to
       commit the offense before he had
       contact with law enforcement officers
       or their agents. If the defendant was
       predisposed, then he was not en-
       trapped, even though law enforce-
       ment officers or their agents provided
       a favorable opportunity to commit
       the offense, made committing the of-
       fense easier, or participated in acts es-
       sential to the offense.

At the instructions conference, Hilliard's defense counsel
objected based on the difference between subsection 1 of the
instruction given and that of Seventh Circuit Pattern Instruc-
tion § 6.04, which reads: "Law enforcement officers and their
agents *did not persuade or otherwise induce … .*" Pattern Crimi-
nal Jury Instructions of the Seventh Circuit § 6.04 (2012) (em-
phasis added). Hilliard points out on appeal that we used
both "induce" and "persuade" throughout our en banc opin-
ion in *Mayfield*, in which we "clarif[ied] the doctrine [of en-
trapment] both substantively and procedurally." 771 F.3d at
420. Hilliard also notes that the Supreme Court likewise used
"persuade" in the "seminal" entrapment cases *Sorrells v.
United States*, 287 U.S. 435 (1932) and *Sherman v. United States*,
356 U.S. 369 (1958). Two additional instructions that were
given—one of which the parties both agreed on and the other

one of which defendant agreed to after a minor edit—further defined the term "inducement."

The government argued at the instructions conference and maintains on appeal that *Mayfield* defined "inducement" in such a way that retaining the word "persuade" from the pattern instruction would be inappropriate. *Mayfield* held in relevant part that inducement "means more than mere government solicitation of the crime; the fact that government agents initiated contact with the defendant, suggested the crime, or furnished the ordinary opportunity to commit it is insufficient to show inducement." 771 F.3d at 434; *see also id.* at 433 ("[S]omething more is required, either in terms of the character and degree of the government's persistence or persuasion, or the nature of the enticement or reward … ."). Rather, "inducement means government solicitation of the crime *plus* some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts." *Id.* at 434–35. We then noted that the "other conduct" could include "repeated attempts at persuasion, fraudulent representations, … coercive tactics, harassment," etc. *Id.* at 435. Given *Mayfield*'s explicit reference to persuasion as only one part of the required showing for inducement, Hilliard's proposed instruction (that is, Pattern Instruction § 6.04) could have incorrectly led the jury to believe a defendant could satisfy the inducement prong by showing mere persuasion. The district court thus acted within its discretion in giving the instruction it did.

### 2. *Government's Good Faith*

The court also gave the following non-pattern instruction proposed by the government:

> The law does not require the government to
> have a pre-existing good faith basis for suspect-
> ing criminal activity before a government of-
> ficer may initiate an undercover investigation.

Hilliard's defense counsel objected at the instructions confer-
ence that this instruction was unnecessary to the defense of
entrapment, as "whether or not [the government] had a
preexisting good-faith basis for suspecting criminal history
has nothing to do with [Hilliard's] predisposition," or "in-
ducement." Counsel contended that including this irrelevant
instruction could confuse the jury. On appeal, Hilliard again
argues that this non-pattern instruction was irrelevant and
"served only to provide a gratuitous imprimatur to the gov-
ernment's conduct on a matter not in issue."

The government responds that a key defense argument
was that Hilliard had not been engaged in dealing drugs prior
to being approached by Romano. Thus, the government ar-
gues, the instruction was helpful in case the jury was confused
about whether predisposition required an inquiry into what
the "agents did know and didn't know" about Hilliard's
pre-sting activities at the time the operation had begun. With-
out this instruction, which accurately states the law, *see, e.g.*,
*United States v. Miller*, 891 F.2d 1265, 1269 (7th Cir. 1989), the
jury could have mistakenly perceived the government's initi-
ation of the operation, without knowledge of prior or ongoing
drug dealing by Hilliard, as evidence of alleged inducement
or entrapment. As such, the district court acted within its dis-
cretion in including this instruction; and given the numerous
other instructions provided regarding the two elements, there
was little possibility of prejudice to Hilliard stemming from
this particular instruction's inclusion.

### 3. *Definition of Predisposition*

The government and Hilliard each submitted a proposed instruction defining "predisposition" based on *Mayfield*. The government's proposed instruction, which the court ultimately adopted, read, "A defendant is predisposed to commit the charged crime if he was ready and willing to do so and likely would have committed it without the government's intervention, or actively wanted to but hadn't yet found the means."

Hilliard's proposed instruction consisted of the complete, verbatim holding in *Mayfield* on the definition of predisposition:

> A defendant is predisposed to commit the charged crime if he was ready and willing to do so and likely would have committed it without the government's intervention, or actively wanted to but hadn't yet found the means. The defendant's predisposition is measured at the time the government first proposed the crime, but the nature and degree of the government's inducement and the defendant's responses to it are relevant to the determination of predisposition. A prior conviction for a similar offense is relevant but not conclusive evidence of predisposition; a defendant with a criminal record can be entrapped.

However, the district court found that the defense's proposed instruction was unnecessary, because the first two sentences were already included in the government's proposed instruc-

tions and the third sentence was ultimately made into an independent instruction. Defense counsel expressed a preference to read all of the above as one instruction, but the district court explained, "[T]he reason I like [the government's breakdown of the definition], is it's a kind of foreign concept, entrapment, and because I'm turning pages while I'm doing this, … I think what it does is it gives emphasis to three theories for three aspects of the way we look at entrapment and does it in a way that might be lost if it's in one instruction." Given this explanation of the district court's choice of organization, as well as the fact that the jury did ultimately hear all three sentences from the defense's proposed instruction, which together accurately stated the law, the district court acted well within its discretion in giving the instruction it did.

### 4. Factors to Consider With Respect to Predisposition or Entrapment

Lastly, both the government and Hilliard submitted proposed instructions on the factors to be considered in evaluating Hilliard's defense. Hilliard asked that the court give the pattern instruction listing factors relating to entrapment as a whole, whereas the government proposed a shorter list of factors for predisposition based on *Mayfield*. The district court ultimately gave the latter instruction, which read:

> Some factors you may consider in deciding whether the defendant was predisposed include:
>
> > (1) the defendant's character or reputation;
> >
> > (2) whether the government initially suggested the criminal activity;

(3) whether the defendant engaged in
the criminal activity for profit;

(4) whether the defendant evidenced a
reluctance to commit the offense that
was overcome by government per-
suasion; and

(5) the nature of the inducement or per-
suasion by the government.

No one factor controls and you may consider
other factors. However, the most significant fac-
tor you should consider is whether the defend-
ant was reluctant to commit the offense.

In contrast, the pattern instruction on entrapment included as
a factor "[w]hether the defendant was reluctant to engage in
criminal activity," and also stated, "It is up to you [the jury]
to determine the weight to be given to any of these factors and
any others that you consider." Pattern Criminal Jury Instruc-
tions of the Seventh Circuit § 6.05. Hilliard argues that the
given instruction diverged from the pertinent pattern, which
*Mayfield* never suggested was wrong, and confused the jury
by elevating the reluctance factor over all others.

The government responds that the pattern instruction pre-
dates *Mayfield*, which clarified which factors apply to induce-
ment, which ones apply to predisposition, and which may ap-
ply to both. The instruction given lays out verbatim the lan-
guage from *Mayfield* for determining predisposition, includ-
ing the language stating that the most significant factor is
whether the defendant was reluctant to commit the offense.
*See* 771 F.3d at 435 (citation omitted). *Mayfield* went on to pro-
vide the aforementioned "legal definition of predisposition,"
so that jurors would know what to look *for* when weighing

the above factors, *id.*; but consideration of the five factors listed remains the law. Here, it seems the district court did just as *Mayfield* recommended: It provided the definition of predisposition and the factors to be considered in evaluating Hilliard's defense.

### III. Conclusion

For the foregoing reasons, we AFFIRM Hilliard's conviction and sentence.