NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted September 15, 2021[*]
Decided February 7, 2022

**Before**

DAVID F. HAMILTON, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

THOMAS L. KIRSCH II, *Circuit Judge*

No. 18-1919

| | |
|---|---|
| UNITED STATES OF AMERICA, | Appeal from the United States District |
| *Plaintiff-Appellee,* | Court for the Northern District of Illinois, Eastern Division. |
| *v.* | |
| | No. 11 CR 497 |
| FABRIEAL DELANEY, | |
| *Defendant-Appellant.* | Manish S. Shah, *Judge.* |

### O R D E R

A jury convicted Fabrieal Delaney of sex-trafficking three women. Now proceeding pro se, Delaney raises a host of appellate challenges. We affirm.

The offenses included trafficking a woman named Olivia by force, threats of force, fraud, or coercion, 18 U.S.C. § 1591(a)(1), (a)(2); trafficking two minors, Casey and

---

[*] We have agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

Caitlin, *id.;* transporting the minors to engage in commercial sex, *id.* § 2423(a); and attempting to obstruct the investigation, *id.* § 1591(d). Delaney's resulting sentence was 540 months' imprisonment and 5 years' supervised release.

According to government witnesses, Delaney screened 10 to 15 clients a day for Olivia to meet in Illinois hotels. He kept her earnings. Although Delaney characterized their relationship as romantic, Olivia testified that Delaney "hit" and "punched" her, once held a steam iron near her face until she fainted in fear, and sometimes placed her "on punishment" when she failed to answer calls from clients. In phone calls recorded after his unrelated arrest, Delaney asked Olivia to "work" to raise money for his bond, reminded her of the steam-iron incident, and warned her not to betray him.

As for the minors (both age 16 during the scheme), Delaney let them keep half the money clients paid them. But the minors then "pooled" their resources with him for joint purchases—including heroin. Casey testified that she did not want to sell sex, but felt she had to do so to maintain Delaney's romantic interest in her. And, she told jurors, Delaney was violent: He slapped her in the face after a client underpaid her, pushed her into a wall when she did not want to work, and warned her about the steam-iron incident with Olivia. Caitlin, meanwhile, testified that she prostituted herself as a minor because she loved Delaney and the people around him. Delaney was caught when he drove the two minors from Michigan to Illinois to "work" at a "bachelor party" that turned out to be a police sting aided by Olivia.

At trial Delaney testified and argued that all three purported victims prostituted themselves voluntarily, that his relationship with Olivia was principally romantic (if tumultuous), and that any violence was prompted by fears of her infidelity. He characterized Olivia's father as a pimp and Olivia as the architect of the minors' prostitution. As for the "bachelor party," he testified, he did not know the minors planned to engage in prostitution there. Still, Delaney conceded that he eventually learned that Casey and Caitlin were under the age of 18.

Over Delaney's objection, the district court allowed the state to admit expert testimony from Dr. Sharon Cooper, a physician who outlined common tactics sex traffickers use to exert control over victims who become emotionally involved with the trafficker. In a written order denying Delaney's motion in limine, the court reasoned that the testimony was reliable and relevant. Dr. Cooper had treated 70 victims, and her studies included discussions with 2,000 or so police officers. This testimony also would help jurors assess Delaney's romance theory and the other witnesses' accounts because sex-trafficking tactics are "not the subject of common knowledge." Meanwhile,

Dr. Cooper's testimony would neither run afoul of the Confrontation Clause nor unduly prejudice Delaney: the doctor would not assert the truth of any particular victim's account described in her studies, nor would she opine directly on Delaney's actions or motivations. And her testimony did not involve technical methods whose reliability must be probed in a hearing under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

The jury found Delaney guilty on all counts. As to Casey, jurors found each trafficking count to be supported by two alternative theories under § 1591: he knew she was younger than 18 when he caused her to engage in commercial sex, and he used fraud or coercion to do so. For Olivia, the charges and verdict were limited to force, threats of force, fraud, or coercion. As to Caitlin, the conviction was based solely on age.

## 1. Dr. Cooper's Testimony

Delaney now challenges Dr. Cooper's testimony on five grounds: (1) the district court should have held a *Daubert* hearing on the reliability of the doctor's methods; the testimony should have been excluded as (2) unlikely to help jurors, (3) unfairly prejudicial, or (4) inadmissible evidence of the character (not just the methods) of sex traffickers; and (5) this testimony violated Delaney's rights under the Confrontation Clause. These challenges are meritless.

Rule 702 of the Federal Rules of Evidence requires expert testimony to be reliable and likely to assist the trier of fact. *Daubert*, 509 U.S. at 589; *United States v. Johnson*, 916 F.3d 579, 586 (7th Cir. 2019). We review a *Daubert* challenge for an abuse of discretion, although we examine de novo whether the district court properly applied the legal framework. *Johnson*, 916 F.3d at 586.

*Daubert* does not always require a hearing on reliability. Whether a hearing is needed depends on whether the expert's testimony applies scientific or other technical methods whose reliability should be probed. *Compare United States v. Godinez*, 7 F.4th 628, 637–38 (7th Cir. 2021), *and Ueland v. United States*, 291 F.3d 993, 997–98 (7th Cir. 2002), *with United States v. Tingle*, 880 F.3d 850, 854 (7th Cir. 2018). Indeed, a hearing is unnecessary if an expert's methods are "properly taken for granted." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Tingle*, 880 F.3d at 854.

Here, the district court rightly determined that Dr. Cooper's testimony about trafficker tactics rested on conventional forms of observational research that need not be tested in a *Daubert* hearing—particularly because Dr. Cooper did not opine on causation

or a similar issue. *See United States v. Vines*, 9 F.4th 500, 505 (7th Cir. 2021); *cf. Johnson*, 916 F.3d at 587–88 (relying, without a hearing, on officer's expertise on the relationship between guns and drugs). It was enough that Dr. Cooper's education and experience permitted her to testify about common behavior patterns among traffickers.

As for assistance to the trier of fact, our caselaw has upheld the introduction of expert testimony in sex-trafficking cases to define "key terms" and explain "common sex-trafficking dynamics" with which jurors may be unfamiliar. *United States v. Young*, 955 F.3d 608, 615 (7th Cir. 2020); *see also United States v. Dingwall*, 6 F.4th 744, 753–54 (7th Cir. 2021) (describing cases); *United States v. Carson*, 870 F.3d 584, 590–92 (7th Cir. 2017) (noting the helpfulness of Dr. Cooper's testimony).

Delaney nonetheless points to *United States v. Delgado*, 677 F. App'x 84 (3d Cir. 2017), as a case where Dr. Cooper was not permitted to testify. Yet on inspection, the Third Circuit's nonprecedential decision in *Delgado* does not support him. There, on interlocutory review, the government unsuccessfully contested a trial judge's preliminary exclusion of Dr. Cooper's testimony. *Id.* at 85. Even so, the trial judge said Dr. Cooper's testimony may become admissible, as a form of rebuttal evidence, if Delgado suggested at trial that an alleged victim voluntarily chose prostitution. *Id.* The Third Circuit approved that proviso. *Id.* at 86. Here, meanwhile, the district court allowed Dr. Cooper's testimony only after Delaney suggested that each woman had prostituted herself voluntarily—a ruling in keeping with *Delgado*.

Still, Delaney contends that Dr. Cooper's testimony should have been excluded under Rule 403 as substantially more prejudicial than probative. But once Delaney sought to persuade jurors that his victims acted voluntarily and this case was about romance, testimony on common sex-trafficking dynamics and tactics became relevant to evaluate the defense theory. The evidence was probative, and not unfairly prejudicial.

Delaney next argues that Dr. Cooper's testimony ran afoul of Rule 404's ban on character evidence. In Delaney's view, Dr. Cooper sought to paint him as having the character of a sex trafficker, thus inviting jurors to infer that he had a propensity to commit trafficking. But the law distinguishes between evidence of common tactics or techniques, which is permissible, and evidence of character, which is not. *See United States v. Williams*, 900 F.3d 486, 491 (7th Cir. 2018); *United States v. Romero*, 189 F.3d 576, 587 (7th Cir. 1999). Our precedents place testimony like Dr. Cooper's on the tactics-and-techniques side of that line. *See Williams*, 900 F.3d at 490–91; *Romero*, 189 F.3d at 587.

Delaney further contends that Dr. Cooper's testimony contravened the Confrontation Clause of the Sixth Amendment by relying on out-of-court statements from professionals and trafficking victims who were not available for cross-examination. This contention, too, is meritless.

The Confrontation Clause bars testimonial hearsay—out-of-court statements given primarily to "establish or prove past events" for a later criminal prosecution—unless there is an opportunity to cross-examine the declarant. *Davis v. Washington*, 547 U.S. 813, 822 (2006); *Crawford v. Washington*, 541 U.S. 36, 51–52 (2004). Here, Dr. Cooper's generalized knowledge of traffickers' techniques derived from professional literature and her overall observation of professionals and sex-trafficking victims (none of whom were involved in this case). The law does not treat the kind of background information Dr. Cooper relied on as testimonial hearsay prepared in anticipation of litigation. *Cf. United States v. Turner*, 709 F.3d 1187, 1190 (7th Cir. 2013) (expert who opines about a controlled substance may rely on information produced by an analyst who does not testify); *United States v. York*, 572 F.3d 415, 428–29 (7th Cir. 2009) (officer interpreted drug jargon based on his expertise, not his involvement in investigation of the defendant).

## 2. Jury Instructions

Delaney next contends that the district court mis-instructed the jury in a variety of ways. Instructional errors will lead us to reverse only if, taken together, there is a reasonable probability that they changed the outcome. *See United States v. Hillard*, 851 F.3d 768, 782 (7th Cir. 2017).

At the outset, Delaney argues that § 1591(e)(2)(B) defines coercion-based trafficking to require a causal link between each of the defendant's threatening acts and a particular sex act by the victim. From that premise, he reasons that the first sentence of Instruction 30 watered down the causation standard:

> To prove sex trafficking by force, or coercion, it is not necessary to link each of the threats allegedly made or actions allegedly taken against an alleged victim to any particular commercial sex act performed by her.

But the premise of this argument is mistaken. Section 1591 defines coercion as "any *scheme, plan, or pattern* intended to cause a person to believe that failure to perform an act would result in serious harm." § 1591(e)(2)(B) (emphasis added). The statute thus requires jurors to look not at each threatening act in isolation, but instead at the entire

course of the defendant's threatening conduct. *See, e.g.*, *United States v. Campbell*, 6 F.4th 764, 771–72 (8th Cir. 2021) (rejecting need for direct link between particular assaults and particular sex acts). The instruction correctly stated the law.

Next, Delaney argues that additional, non-pattern language in Instruction 30 contradicts the definition of the "reasonable person" in § 1591(e)(5). To be sure, the immediately preceding instruction recites the language of that statutory provision verbatim: the harm must be sufficiently serious to compel "a reasonable person of the same background and in the same circumstances" as the alleged victim to engage in commercial sex acts. But a portion of Instruction 30, Delaney contends, reframes that standard as referring to a reasonable person in the alleged victim's "situation" and with the victim's "vulnerabilities." According to Delaney, this subtle deviation from the statutory language turned juror attention toward aspects of the victims' background that made them vulnerable, but away from any aspects of their background that would make them likely to resist coercion or engage in voluntary prostitution.

But even if we overlook Delaney's failure to press this theory at trial, any deviation from the statutory language was harmless here. Considering not only the evidence of physical coercion and threats, but also the challenged instruction's reference to the victims' "situation," plus the recitation of the statutory language in an earlier instruction, there is no reasonable probability that Instruction 30 led jurors to wrongly discount any part of the victims' background that would undercut a finding of coercion.

Delaney further contends (albeit only in a post-briefing letter) that Instruction 30 should have included a mens rea element. But there was no need to include it there, because separate instructions covered mens rea, permitting jurors to convict as to Olivia only if Delaney "knew" that "force, threats of force, fraud, or coercion" would induce commercial sex acts, and as to Casey only if he "knew or recklessly disregarded" that "fraud or coercion would be used to cause" commercial sex acts. (Instruction 30 did not apply to the trafficking of Caitlin at all, because that count was based on Delaney's reckless disregard of her age, not on fraud or coercion.)

Next, Delaney contests an apparent mismatch between the indictment and a jury instruction about Casey. The indictment charged him with using "fraud and coercion" to cause Casey to engage in commercial sex acts. Yet the instruction added references to "force" and "threats of force." But force and threats of force fall within the definition of coercion. Nonetheless, any error on the fraud-or-coercion theory would be harmless because the indictment charged an alternative theory based on Casey's age—and the

jury validated *both* theories by special verdict. The age-based theory suffices to establish Delaney's guilt. *See Young*, 955 F.3d at 615.

Delaney also argues that a limiting instruction did not sufficiently cabin jurors' consideration of evidence that he committed assaults and used or handled illegal drugs. Specifically, the instruction told jurors they could consider evidence of un-charged crimes "to decide whether the defendant knew or recklessly disregarded the fact that threats of force or coercion would be used to cause the alleged victims to engage in a commercial sex act," but "not consider it for any other purpose." This was insufficient, Delaney now says, because it did not explicitly remind jurors that he was not charged with these other crimes, and that jurors should not infer from them that he had a propensity to commit trafficking. But this instruction was agreed on by the parties, and Delaney's counsel affirmed—twice—that he had no objection to it. Under our case law, that affirmation is a waiver of any objection on appeal, and we decline to review the issue further. *See United States v. Morgan*, 929 F.3d 411, 432–33 (7th Cir. 2019).

### 3. Definition of "Minor"

Delaney further asserts that a "minor" is a person 16 years old or younger—whereas, he says, he thought Caitlin and Casey were 17 years old at the relevant time. This argument is mistaken. The case Delaney cites for the 16-year figure, *Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562, 1567 (2017), construed the term "sexual abuse of a minor" under an immigration statute. But the statutes under which Delaney was convicted define a "minor" as a person who has "not attained the age of 18 years." 18 U.S.C. §§ 2423; 1591(a)(2), (b)(2).

### 4. Alleged Perjury

Next, Delaney references an argument from one of his unsuccessful post-trial motions: that the government knowingly used false testimony to obtain his conviction, a tactic forbidden by *Napue v. Illinois*, 360 U.S. 264 (1959). To receive a new trial under *Napue*, a defendant must show "(1) that there was false testimony; (2) that the government knew or should have known it was false; and (3) that there is a likelihood that the false testimony affected the judgment of the jury." *United States v. Cardena*, 842 F.3d 959, 976–77 (7th Cir. 2016). On this record, however, Delaney has not shown that any witness lied, let alone that prosecutors should have spotted a lie.

Delaney's post-trial motion cited an unnamed FBI agent's report—apparently revealed in discovery, but not included in the trial record—recounting an agent's

statement to Olivia that, "in essence," she would be "arrest[ed]" if she did not cooperate against Delaney. This report contrasts with the testimony of Mike Barker, a case agent who told jurors that he had no knowledge of a threat to arrest Olivia, and that if a threat to arrest her were made without his knowledge, he could not testify to it. But that is hardly proof that Agent Barker was lying.

Delaney also asserted that the FBI report proved Olivia lied to jurors about the threat of arrest. But, on this record, it is not clear that Olivia did so. Although defense counsel, on cross-examination, elicited testimony that Olivia had reached some kind of cooperation agreement with the government, counsel did not admit the agreement or its terms into the record. Then, when defense counsel asked her, "[D]id the government tell you that unless you cooperated, you're going to get arrested?" she replied, "They did not say it like that." When counsel asked her what she meant, Olivia's attempt to clarify the remark was difficult to grasp: "They said that they believe that I was involved, but as far as my knowledge and my part in what is supposed to be played out, they do not believe that that's what I did." This garbled exchange does not permit us to conclude that Olivia was lying, or that prosecutors should have seen her as lying.

## 5. Assistance of Counsel

Delaney also raises several theories of ineffective assistance of counsel. He first claims that his initial attorney was ineffective for not opposing the government's motion for a 30-day extension of time to return an indictment after his arrest, and that the lawyers who followed were ineffective for failing to resurrect that issue. *See* 18 U.S.C. § 3161(b).

Of course, since *Massaro v. United States*, 538 U.S. 500 (2003), we have persistently warned defendants about the risks of raising an ineffective-assistance claim on direct appeal (as opposed to a collateral attack). When review is confined to the trial record, it is hard to explore counsel's strategic reasoning; meanwhile, asserting ineffective assistance on direct appeal will foreclose opportunities to raise other theories of ineffective assistance in a future collateral attack. *United States v. Cates*, 950 F.3d 453, 457 (7th Cir. 2020). We therefore issued an order reminding Delaney about the risks of pursuing an ineffectiveness claim now and asking him to confirm that he wishes to proceed to a decision on the existing record. In his response, Delaney insists that the record is fully developed and asks us to review his claim today, as is his right. *See id.* at 458.

Delaney's ineffective-assistance claim fails because he cannot show a reasonable probability that a speedy-trial objection would have yielded a different outcome. *See Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984) (outlining reasonable-probability standard). The Speedy Trial Act permits an extension of the 30-day deadline if the court finds that "justice" outweighs "the best interest of the public and defendant in a speedy trial." 18 U.S.C. § 3161(b), (h)(7)(A). Here, the district court made this finding on the record, and Delaney has not explained how counsel could have convinced that court to reach a different result.

To be sure, Delaney insists that he need not show deficient performance or prejudice because counsel, he says, entirely failed to subject the government's case to adversarial testing under *United States v. Cronic*, 466 U.S. 648 (1984). But no authority cited by Delaney or known to us supports his view that declining to lodge a meritless speedy-trial objection can be treated as a wholesale failure of adversarial testing.

Delaney further contends that the district court erred by denying his post-trial motion without holding an evidentiary hearing to explore whether his trial counsel was ineffective for other reasons. Nearly three years following trial, and after submitting a series of other post-trial motions challenging prosecutorial misconduct and the sufficiency of the evidence, Delaney filed what he labeled as a motion for judgment of acquittal. There, he reasserted arguments that he had previously made in other post-trial motions, adding for the first time that his trial counsel was deficient by failing to object to the government's incomplete presentation of calls that he made after an unrelated arrest and by failing to admit the complete audio evidence. The district court, however, determined that Delaney did not present any meritorious argument, nor did he show that an evidentiary hearing was needed to resolve any of his claims.

The district court did not abuse its discretion here. Regardless of counsel's reasoning in making the decisions Delaney challenges, there would be no reasonable probability that the other portion of the calls—either submitted by his counsel or the government—would have produced a different outcome. The handwritten transcripts of the omitted conversations that he attached to his motion cast no doubt on his conviction. At the very least, these conversations would have no reasonable probability of overcoming the other trial evidence of guilt. An evidentiary hearing, then, could make no difference.

As for Delaney's assertion that counsel was ineffective on other grounds, he did not raise them in his post-trial motion. He therefore cannot fault the district court for not considering those arguments. In any event, our review of the trial record reveals no

sign that counsel performed deficiently, or that different strategies would yield a reasonable probability of a different result.

Finally, we have considered Delaney's other arguments, but none has merit.

AFFIRMED